[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 15, 2005
THOMAS K. KAHN
CLERK

No. 03-16243
_____

D. C. Docket No. 03-00904-CV-T-23-TBM

ELIAS ABUSAID, JR.,
a.k.a. Lou,

                                                    Plaintiff-Appellant,

versus

HILLSBOROUGH COUNTY BOARD OF COUNTY COMMISSIONERS,
HILLSBOROUGH COUNTY FIRE MARSHAL'S OFFICE,
HILLSBOROUGH COUNTY,
a political subdivision of the State of Florida,
HILLSBOROUGH COUNTY SHERIFF'S OFFICE,

                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(April 15, 2005)**

Before MARCUS, FAY and SILER[*], Circuit Judges.

_____

[*]Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting
by designation.

MARCUS, Circuit Judge:

At issue today is whether a Florida county sheriff, acting to enforce a county dance hall ordinance, is an arm of the state entitled to the benefit of the state's Eleventh Amendment immunity from suit in federal court. We conclude that the sheriff is not an arm of the state in this case and, accordingly, we reverse the district court's dismissal of Appellant's § 1983 claims against the Hillsborough County Sheriff as being barred by the Eleventh Amendment and remand for further proceedings. We also reverse the district court's dismissal of Appellant's civil rights claims against Hillsborough County, since the Eleventh Amendment does not immunize municipalities from suit.

I.

The story begins when appellant Elias Abusaid, Jr., opened a private night club in Hillsborough County, Florida (the "County"), in November 1999. The record is unclear as to precisely what type of club Abusaid was operating, but Abusaid characterizes himself as "engaged in the entertainment, promotional, nightclub, private club and bottle club business." Appellant's Supp. Br. at 3.

On November 16, 1999, the County adopted an ordinance regulating "Rave" or "Dance Halls" (the "Dance Hall Ordinance" or the "Ordinance"), defined as clubs featuring music and dancing, but not licensed to serve alcohol. The

2

Ordinance required that the operator of a dance or rave hall obtain a permit by applying to the County's "Rave/Dance Hall Administrator," who is required to grant a permit unless one of six enumerated criteria is present: the applicant is under 18; the application contains false information; the applicant has been convicted of violating the Ordinance within 2 years; the applicant has failed to obtain fire marshal certification; the applicant has failed to obtain certification of compliance with the Land Development Code; or the applicant has a prior criminal conviction for an enumerated offense. The Ordinance also forbids anyone under 18 years of age from being present in a dance/rave hall after midnight, and forbids those under 21 years of age from being present in a dance/rave hall after 3:00 a.m. Violations of the Dance Hall Ordinance are punishable by up to 60 days incarceration and a fine of up to $500.

Beginning in June 2000, the County, its Sheriff, and its Fire Marshal undertook a series of actions to enforce the Dance Hall Ordinance against Abusaid. The relevant facts, as Abusaid alleges them, are these. On June 3, 2000, the Sheriff arrested Abusaid and charged him with a number of criminal violations, including violations of the Dance Hall Ordinance. Subsequently, the Sheriff arrested Abusaid and charged him with violations of the Dance Hall Ordinance three more times, on June 9, 10, and 17, 2000. In addition, on June 9, 2000, the Fire Marshal

issued a cease and desist order, summarily closing Abusaid's business. On June 19, 2000, Sheriff's deputies drove their cars onto Abusaid's business property and threatened Abusaid's employees "to quit their jobs or be arrested," threatened patrons with arrest, "and otherwise blocked and intimidated patrons from entering the business." Appellant's Supp. Br. at 6. Abusaid further alleges that the County threatened legal action against his landlord in June 2000, which resulted in the landlord filing to evict Abusaid.

Abusaid was tried on the criminal charges in September 2000, and found guilty of three counts of operating a rave/dance hall without a permit and one count of selling alcoholic beverages without a license. He was sentenced to a total of eighteen months' probation, with a 60-day jail sentence suspended. He was also fined $111 for each guilty count.[1]

On May 13, 2003, Abusaid sued the Board of County Commissioners of Hillsborough County (the "Board"), the Fire Marshal's Office of Hillsborough County (the "Fire Marshal"), the Hillsborough County Sheriff's Office (the

---

[1]Abusaid was apparently tried before three separate juries. One trial was held on the charges arising out of Abusaid's June 3, 2000 arrest (which included one count of operating a bottle club without a license, one count of operating a rave/dance hall without a permit, and one count of selling alcoholic beverages without a license), another on the charge arising out of his June 9, 2000 arrest (one count of operating a dance hall without a permit), and the third trial on the charge arising out of his June 10, 2000 arrest (one count of operating a dance hall without a permit). The first jury acquitted Abusaid on the charge of operating a bottle club without a license, but he was convicted on all other counts.

"Sheriff"), and Hillsborough County (the "County"), in the United States District Court for the Middle District of Florida, acting pro se. His complaint[2] contains eighteen counts. Counts One through Ten assert § 1983 claims based upon alleged violations of unspecified -- though apparently First and Fourteenth Amendment -- constitutional rights. These claims all assert the unconstitutionality of various provisions of the Dance Hall Ordinance, ask that the court declare the Ordinance invalid in its entirety, and claim that Abusaid "is entitled to compensation for the damages he has suffered as a result of the unconstitutional Dance Hall Ordinance" and to costs and attorney's fees. Count Eleven alleges that the County's enforcement of the Dance Hall Ordinance rendered Abusaid's business valueless, and thus constituted a taking under the Fifth Amendment. Counts Twelve and Thirteen raise § 1983 claims against the Sheriff, alleging false arrest and imprisonment, malicious prosecution, and conspiracy. Count Fourteen asserts a § 1983 claim against the Sheriff and the Fire Marshal for conspiring to close Abusaid's business. Count Fifteen adds a § 1983 claim against the Sheriff for trespassing and harassment. Counts Sixteen through Eighteen raise state law claims for tortious interference with a business relationship, intentional infliction

_____

[2]References to the "complaint" are to Abusaid's Second Amended Complaint Seeking Injunctive Relief and Request for Jury Trial, filed October 7, 2003.

of emotional distress, and negligence.

The Board, the Fire Marshal, and the County (collectively, the "County"[3]) jointly moved to dismiss Counts One through Eleven, Fourteen, Sixteen, and Seventeen. The Sheriff filed a motion to dismiss Counts Twelve through Fifteen. The district court, in a two-paragraph order, dismissed all of Abusaid's federal law claims -- Counts One through Fifteen -- as barred by the Eleventh Amendment. The court also declined to exercise supplemental jurisdiction over Abusaid's state law claims and, accordingly, granted both defendants' motions to dismiss Abusaid's complaint in its entirety. It is from this order, entered November 24, 2003, that Abusaid now appeals.

## II.

The Eleventh Amendment to the Constitution bars federal courts from

---

[3]Although Abusaid names the County, the Board of County Commissioners, and the County Fire Marshal as separate defendants, they are jointly represented and are all, for purposes of this suit, the County. The Board is simply the County's governing body and therefore cannot be sued separately. As to the Fire Marshal, the jointly represented defendants correctly argue that since he is sued in his official capacity, "the Fire Marshal's employer, Hillsborough [County], is the proper party to this action." Answer Br. of Appellees at 6 (citing Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991)); see also Busby, 931 F.2d at 776 ("[W]hen an officer is sued under Section 1983 in his or her official capacity, the suit is simply 'another way of pleading an action against an entity of which an officer is an agent.' Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents." (quoting Kentucky v. Graham, 473 U.S. 159, 165, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) (footnote, citation, and internal quotation marks omitted)). These defendants therefore "respond[] to Abusaid's § 1983 claims as if they were brought only against Hillsborough [County]," Answer Br. of Appellees at 7, and we, likewise, treat all three separately named defendants collectively, as "the County."

6

entertaining suits against states. The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const., amend. XI. Although, by its terms, the Eleventh Amendment does not bar suits against a state in federal court by its own citizens, the Supreme Court has extended its protections to apply in such cases. Hans v. Louisiana, 134 U.S. 1, 10 S. Ct. 504, 33 L. Ed. 842 (1890); see also Manders v. Lee, 338 F.3d 1304, 1308 n.8 (2003) (en banc). This Court reviews de novo a district court's ruling regarding Eleventh Amendment immunity. Hundertmark v. Fla. Dep't of Transp., 205 F.3d 1272, 1274 (11th Cir. 2000).

As we explained in our recent en banc decision in Manders v. Lee, the law is "well-settled that Eleventh Amendment immunity bars suits brought in federal court when an 'arm of the State' is sued." Id. at 1308. The more difficult question -- whether the entity sued is an arm of the state -- "must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." Id. As the Supreme Court has explained in determining whether a sheriff is a state or county policymaker for purposes of a § 1983 action, "the question is not whether [the sheriff] acts for [the state] or [the

7

county] in some categorical, 'all or nothing' manner," but rather whether the sheriff is acting for the state "in a particular area, or on a particular issue." McMillan v. Monroe County, 520 U.S. 781, 785, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997) (holding that Alabama sheriff was policymaker for the state, not for the county).

To determine whether the defendant, while engaged in the relevant function, acts as an arm of the state, we conduct a four-factor inquiry, taking into account (1) how state law defines the entity; (2) what degree of control the state maintains over the entity; (3) the source of the entity's funds; and (4) who bears financial responsibility for judgments entered against the entity. See Manders, 338 F.3d at 1309.

When the defendant entity is a county sheriff, our determination is dependent on the law of the state in which the sheriff operates, since "states have extremely wide latitude in determining their forms of government and how state functions are performed." Id. at 1309 n.10; see also McMillan, 520 U.S. at 786 ("[O]ur inquiry is dependent on an analysis of state law. This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy. But our understanding of the actual function of a governmental official, in a particular area, will necessarily be

8

dependent on the definition of the official's functions under relevant state law."

(citations omitted)).

The relevant "function" in this case is enforcement of a County ordinance. Indeed, all of Abusaid's claims against the Sheriff arise out of actions taken in the course of enforcing Hillsborough County's Rave/Dance Hall Ordinance. The Ordinance, which was "enacted pursuant to the statutory police powers of Hillsborough County," Dance Hall Ordinance §1, assigns the duty of enforcement to the Sheriff. The Ordinance expressly provides that:

> The Sheriff is responsible for providing information on whether an applicant has been convicted of a Specified Criminal Act during the time period set forth in Section 5(b)(6) below, inspecting any proposed, permitted or non-permitted Rave/Dance Hall in order to ascertain whether it is in compliance with the Rave/Dance Hall Ordinance, applicable criminal statutes and ordinances, and for enforcing the Rave/Dance Hall Ordinance, applicable criminal statutes and ordinances.

Dance Hall Ordinance § 5(a)(2) (emphasis added).

Accordingly, the proper inquiry is whether the Sheriff acts as an arm of the state in enforcing the County's ordinance.[4] Both the precedent of this Court and

---

[4]In Manders, we defined the relevant functions as "Sheriff Peterson's force policy at the jail and the training and disciplining of his deputies in that regard." Manders, 338 F.3d at 1308-09. When performing these functions, the Georgia sheriff was acting pursuant to a grant of authority by the state, since "[t]he sheriff's authority to use force . . . and the sheriff's obligation to administer the jail are directly derived from the State and not delegated through the county entity." Id. at 1319. Here, in contrast, the Sheriff plainly was acting pursuant to a grant of authority by the County, codified in a County ordinance.

the law of the State of Florida unambiguously answer this question in the negative -- a Florida sheriff does not act as an arm of the state in enforcing a county ordinance.

As to our precedent, we have repeatedly held that Florida's sheriffs are not arms of the state. This was established definitively in Hufford v. Rodgers, 912 F.2d 1338 (11th Cir. 1990), where a panel of this Court applied our four-factor test to conclude that a county sheriff, acting to remove a child from his mother's custody pursuant to the father's affidavit asserting custody, was not an arm of the state and therefore not entitled to Eleventh Amendment immunity from a § 1983 suit in federal court. Our case precedent has uniformly followed Hufford. See, e.g., Hutton v. Strickland, 919 F.2d 1531, 1542 (11th Cir. 1990) (following Hufford in case involving § 1983 claim against sheriff and deputies for trespass arising out of attempts to repossess plaintiffs' property); Ortega v. Schramm, 922 F.2d 684, 694 (11th Cir. 1991) (following Hufford in § 1983 case involving malicious prosecution and assault and battery claims arising out of search and arrest by sheriff's deputies); Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991) (following Hufford in § 1983 case alleging wrongful arrest and detention); Schmelz v. Monroe County, 954 F.2d 1540, 1543 (11th Cir. 1992) (following Hufford in § 1983 suit arising out of inmate's suicide attempt in county jail); see

10

also Gordan v. Cochran, 116 F.3d 1438, 1439 n.1 (11th Cir. 1997) (entertaining § 1983 suit against Florida sheriff for wrongful discharge of employees in violation of their First and Fourteenth Amendment rights, and noting that Hufford established that Eleventh Amendment was not a bar to § 1983 suits against Florida sheriff).

Indeed, the only reason that Hufford is not controlling today is that our subsequent en banc decision in Manders and the Supreme Court's related decision in McMillan make clear that the arm of the state determination must be made on a function-by-function basis, which Hufford did not do. See Manders, 338 F.3d at 1308-09 (holding that the sheriff of Clinch County, Georgia acted as an arm of the state in promulgating a use-of-force policy); McMillan, 520 U.S. at 785-86 (holding that the sheriff of Monroe County, Alabama, acting in a law enforcement capacity, was a state rather than a county policymaker for purposes of a § 1983 action). Although Hufford correctly applied this Circuit's four-factor test for arm of the state status, it determined across the board -- or at least for purposes of all § 1983 actions -- that a Florida sheriff is not an arm of the state, without tailoring its analysis to the particular function involved in that case. See, e.g., Hufford, 912 F.2d at 1342 ("[S]ince sheriffs in Florida act only on behalf of the counties they serve, we hold that the Eleventh Amendment does not protect Florida sheriffs from

11

liability under section 1983.").

Other than the advent of a function-by-function approach, little has changed since Hufford was decided in 1990. The relevant Florida law remains essentially unaltered. Our four-factor test, which Hufford applied, remains intact. Moreover, the Supreme Court's holding in McMillan that an Alabama sheriff was a policymaker for the state, and this Court's holding in Manders that a Georgia sheriff was an arm of the state, do not compel the outcome in this case, since those cases stressed that their conclusions were highly dependent on the particularities of state law. Manders also closely circumscribed its holding, explaining: "[W]e narrowly decide only that Georgia sheriffs in their official capacity act for the State in establishing force policy in the county jail and in training and disciplining their deputies in that regard." Manders, 338 F.3d at 1324 n.45.

Our close review of Florida's statutes and case law yields the conclusion that Florida defines sheriffs and their functions very differently than Alabama or Georgia. Applying our four-factor test, we reaffirm the continuing validity of Hufford's analysis and conclude that a Florida sheriff, when acting to enforce a county ordinance, is not an arm of the state and therefore not entitled to Eleventh Amendment immunity. We discuss each of the four factors in turn.

The first factor -- how state law defines the entity -- weighs heavily against

12

assigning arm of the state status to a Florida sheriff. Florida's constitution labels sheriffs "county officers." Fla. Const. art. VIII, § 1(d). The constitution further provides that sheriffs generally "shall be elected by the electors of each county, for terms of four years," but allows counties to adopt alternative means of selecting sheriffs (or other county officers) if they choose. Id. ("There shall be elected by the electors of each county, for terms of four years, a sheriff . . . ; except, when provided by county charter or special law approved by vote of the electors of the county, any county officer may be chosen in another manner therein specified . . . .").

Moreover, Florida's constitution expressly authorizes counties to abolish the office of the sheriff altogether, provided that all of its duties are transferred to another office. Id. (by decision of the county's electors, "any county office may be abolished when all the duties of the office prescribed by general law are transferred to another office"); see also Dade County v. Kelly, 153 So. 2d 822, 824 (Fla. 1963) (holding that Dade County, "under its charter and pertinent ordinances, had the power to abolish the appellee's office of County Sheriff, to hire the appellee on a daily basis to serve at the will of the manager and to fire him without cause or notice"). But see Dade County v. Kelly, 99 So. 2d 856 (Fla. 1958) (holding that county could transfer all duties of sheriff to another office and abolish office of

13

sheriff, but could not do so piecemeal).

The Florida Supreme Court reiterated, in Beard v. Hambrick, 396 So. 2d 708 (Fla. 1981), that "a sheriff is a 'county official,' and, as such, is an integral part of the 'county.'" Id. at 711 (holding that Florida's waiver of sovereign immunity for political subdivisions, including counties, applied to "sheriffs as well as other named county officers as part of a county"). In fact, in a case brought by the Sheriff of Hillsborough County, the Supreme Court of Florida said: "In the case now before the Court the suit was brought by the sheriff who is an officer of Hillsborough County and is the chief executive and law enforcement officer of the county, clothed with important duties and responsibilities." Blackburn v. Brorein, 70 So. 2d 293, 296 (Fla. 1954) (emphasis added).

Still another Florida intermediate appellate court recently reiterated this basic principle, in Jenne v. Maranto, 825 So. 2d 409 (Fla. Dist. Ct. App. 2002): "The Florida Constitution names the Sheriff as a county official, not as an official of the State." Id. at 416. Thus, although the Sheriff undeniably performs some duties for the state, such as serving process, "[o]n balance . . . the Sheriff is an official of local government, rather than an arm of the State." Id.[5] Because, as the

_____

[5]The Fourth District Court of Appeal held in Jenne that a Florida sheriff, sued for violation of the Equal Pay Act, was "not an arm of the State and [was] not entitled to claim the constitutional immunity protected by the Eleventh Amendment." Id. at 416. Why the Florida

14

<u>Hufford</u> Court concluded, Florida's constitution and case law establish overwhelmingly that Florida law defines sheriffs as county officials, the first factor of our test weighs against arm of the state status.

The <u>second</u> factor -- the degree of state control over the sheriff -- is arguably mixed, but still weighs against arm of the state status. A number of Florida's statutory provisions are relevant. First, as we have noted, the constitutional default rule is that a sheriff is elected by county voters every four years, but counties are free to change that procedure or even to abolish the office of the sheriff altogether, which strongly suggests that the state has relinquished to the counties substantial

state court entertained the sheriff's claim of Eleventh Amendment immunity at all is unclear, since Eleventh Amendment immunity protects the state and arms of the state from suit <u>only</u> in federal court. Nevertheless, conducting an analysis similar to our four-factor test, the Florida court held that the sheriff was a county official, not a state official, and therefore was not entitled to claim the state's Eleventh Amendment immunity. The court reasoned:

> Florida is divided into political subdivisions, the several Counties, and the Sheriff is a constitutional officer in each County. Art. VIII, § 1(a), (d), Fla. Const. The Counties are political subdivisions but they are not the State itself. The Florida Constitution names the Sheriff as a county official, not as an official of the State. Art. VIII, § 1(d), Fla. Const. Although the Sheriff performs many functions -- e.g., the Sheriff is responsible for serving process within the County -- his budget is made up by the County from taxes levied only within the County. Moreover, the Sheriff is authorized to purchase liability insurance for, among other things, "claims arising out of the performance of the duties of the Sheriff. . . ." Thus any money judgment in this case will be paid from the local county budget or by insurance purchased therefrom by the Sheriff.

> On balance therefore the Sheriff is an official of local government, rather than an arm of the state.

<u>Id.</u> (footnotes omitted).

control over the office of the sheriff.  See Fla. Const. art. VIII, § 1(d).

If a county elects to retain the office of the sheriff, it has substantial discretion over how to utilize that office.  For example, state law authorizes counties to require bond from sheriffs, but leaves it to each individual county to determine whether to do so and in what amount.  See Fla. Stat. §§ 30.01, 30.02, 30.09.  Similarly, state law provides that a county may designate its sheriff as its chief corrections officer, and then, only "[i]f designated," the sheriff must "enforce all existing state law concerning the operation and maintenance of county jails."  Id. § 951.061(2); see also, e.g., id. § 30.60 ("A county sheriff . . . may establish neighborhood crime watch programs within the county . . . ." (emphasis added)).

We add that the sheriff is required to maintain his office at the place of the county seat, and to reside at the county seat or within two miles thereof, illustrating the essentially local nature of the office.  Id. §§ 30.10, 30.11.  Moreover, any "fees, commissions, or other funds collected by the sheriff for services rendered or performed by his or her office shall be remitted monthly to the county," suggesting that sheriffs are financially accountable to their counties, not to the state.  Id. § 30.51(5).

Florida law also gives sheriffs' great independence in their day-to-day operations, stating: "The independence of the sheriffs shall be preserved

16

concerning the purchase of supplies and equipment, selection of personnel, and the hiring, firing, and setting of salaries of such personnel . . . ."  Id. § 30.53. Accordingly, as to these day-to-day operations, the state has retained no control over sheriffs.  Florida's courts have explained that "[t]he sheriff has absolute control over the selection and retention of deputies in order that law enforcement be centralized in the county, and in order that the people be able to place responsibility upon a particular officer for failure of law enforcement." Szell v. Lamar, 414 So. 2d 276, 277 (Fla. Dist. Ct. App. 1982) (citing Fla. Stat. § 30.53); see also Blackburn, 70 So. 2d at 298 ("It is essential to law enforcement in the various counties of the State that the people shall be able to place responsibility upon a particular individual, the sheriff.").  All of this generally weighs in favor of the county-oriented nature of the office of the sheriff in Florida.

The state does, however, retain some control over its sheriffs.  Thus, in extraordinary circumstances, for example, the governor may remove a county officer.  Fla. Const. art. IV, § 7 ("By executive order stating the grounds and filed with the custodian of state records, the governor may suspend from office any state officer not subject to impeachment, any officer of the militia not in the active service of the United States, or any county officer, for malfeasance, misfeasance, neglect of duty, drunkenness, incompetence, permanent inability to perform

17

official duties, or commission of a felony, and may fill the office by appointment for the period of suspension." (emphasis added)). However, this removal power applies only in extraordinary circumstances, and the Sheriff has shown us no instance in which the governor has actually exercised this authority to remove a sheriff (or any other county officer, for that matter). Notably, this provision refers generically to all county officers, a designation that presumably includes sheriffs, but also that reiterates the sheriff's status as an officer of the county, regardless of the governor's authority to remove him in extraordinary circumstances.

Also in extraordinary circumstances, the governor retains the authority to enlist sheriffs to help keep the peace. The governor, upon declaration of a state of emergency, see Fla. Stat. § 14.022(2), may "[o]rder any sheriff or sheriffs of this state, pursuant to a proclamation as herein provided, to exercise fully the powers granted them, and each of them, under § 30.15(1)(f) (suppress tumults, riots, and unlawful assemblies in their counties with force and strong hand when necessary) and to do all things necessary to maintain peace and good order." Id. § 14.022(3)(b). Like the power to remove a sheriff, this power applies only in exceptional circumstances, and does not alter that under Florida's regime the Sheriff generally functions as a county official.

State law also fixes a salary scale for sheriffs, see Fla. Stat. § 145.071(1),

18

and provides for a bonus for sheriffs meeting certain statewide qualification standards, see id. § 145.071(2)(a). However, the salaries set for sheriffs are part of a chapter of the Florida Code that sets uniform salaries for nearly all county officials -- including even members of the board of county commissioners -- apparently because such uniformity is required by the Florida Constitution. See Fla. Const. art. II, § 5(c); Fla. Stat. § 145.011(1)-(2) ("In compliance with § 5(c), Art. II of the State Constitution, it is the intent of the Legislature to provide for the annual compensation and method of payment for the several county officers named herein. . . . The Legislature has determined that a uniform and not arbitrary and discriminatory salary law is needed to replace the haphazard, preferential, inequitable, and probably unconstitutional local law method of paying elected county officers.").[6] Moreover, it is the counties that pay these salaries, see Fla.

---

[6]One Florida court has explained the evolution of the salary system in these terms:

> [Section 30.49] provides machinery for budgeting the fiscal affairs of the sheriff of each county. Florida originally established a statutory fee system for compensating a sheriff and financing the sheriff's office. In 1957 the legislature abolished the fee system and placed the sheriff on a salary when it enacted the County Officials Compensation Act. In 1959 the 1957 statute was drastically amended and the precursor to the present § 30.49 was adopted. The statute set up the procedure for adoption of a sheriff's budget and provided the present appeals system. Although the specific provisions of the 1957 and 1959 statutes relating to sheriff's salaries were later declared unconstitutional because they were not uniform throughout the state, this defect was remedied by the 1961 legislature which enacted a separate statute establishing the compensation of county officials including the sheriff's salary. [Section 30.49] still contained the procedure for setting the budget

19

Stat. § 30.49, and, as discussed above, the counties may relieve themselves of that burden by abolishing the office of the sheriff altogether.

State law further prescribes a uniform schedule of fees that sheriffs of all counties must collect for docketing and service of process. Id. § 30.231. However, the fact that the state has an interest in ensuring the uniformity of these fees does not alter the more important fact that the sheriff is required to pay any fees he collects directly into the county treasury. Id. §§ 30.231(5); 30.51(5).

Perhaps the most significant indication of residual state control over county sheriffs is that Florida law expressly enumerates a list of functions that sheriffs must perform. It provides:

    (1)    Sheriffs, in their respective counties, in person or by deputy, shall:

        (a)    Execute all process of the Supreme Court, circuit courts, county courts, and boards of county commissioners of this state, to be executed in their counties.

        (b)    Execute such other writs, processes, warrants, and other papers directed to them, as may come to their hands to be

---

and the appeal provisions. In its infinite wisdom the legislature of the State of Florida concluded that the fee system did not contribute to the objectives of law enforcement but, to the contrary, encouraged volume arrests. Under the present system all fees collected by the sheriff are deposited in the county treasury and the sheriff's budget is established independent of the fees collected, pursuant to the provisions of § 30.49.

Weaver v. Heidtman, 245 So. 2d 295, 296-97 (Fla. Dist. Ct. App. 1971).

executed in their counties.

(c)     Attend all terms of the circuit court and county court held in their counties.

(d)     Execute all orders of the boards of county commissioners of their counties, for which services they shall receive such compensation, out of the county treasury, as said boards may deem proper.

(e)     Be conservators of the peace in their counties.

(f)     Suppress tumults, riots, and unlawful assemblies in their counties with force and strong hand when necessary.

(g)     Apprehend, without warrant, any person disturbing the peace, and carry that person before the proper judicial officer, that further proceedings may be had against him or her according to law.

(h)     Have authority to raise the power of the county and command any person to assist them, when necessary, in the execution of the duties of their office; and, whoever, not being physically incompetent, refuses or neglects to render such assistance, shall be punished by imprisonment in jail not exceeding 1 year, or by fine not exceeding $500.

(i)     Be, ex officio, timber agents for their counties.

(j)     Perform such other duties as may be imposed upon them by law.

(2)     Sheriffs, in their respective counties, in person or by deputy, shall, at the will of the board of county commissioners, attend, in person or by deputy, all meetings of the boards of county commissioners of their counties, for which services they shall

> receive such compensation, out of the county treasury, as said boards may deem proper.
>
> (3) On or before January 1, 2002, every sheriff shall incorporate an antiracial or other antidiscriminatory profiling policy into the sheriff's policies and practices, utilizing the Florida Police Chiefs Association Model Policy as a guide. Antiprofiling policies shall include the elements of definitions, traffic stop procedures, community education and awareness efforts, and policies for the handling of complaints from the public.

Fla. Stat. § 30.15.

That the state prescribes some functions for sheriffs is not insignificant, nor does it transform sheriffs into state officers in the execution of all duties, for several reasons. For one thing, this list does not alter the ability of a county to assign its sheriff whatever additional duties it sees fit. Thus, for example, the County in this case assigned the Sheriff the duty of enforcing its Dance Hall Ordinance, and the Sheriff plainly was acting in that county-designated capacity when the events giving rise to Abusaid's lawsuit occurred. Cf. Manders, 338 F.3d at 1319 (observing that in Georgia, "[c]ounties delegate no powers or duties to sheriffs").

Moreover, counties are authorized by the Florida constitution to abolish the office of the sheriff entirely as long as "all the duties of the office prescribed by general law are transferred to another office." Fla. Const. art. VIII, § 1(d). This

22

suggests that the statutory enumeration of certain duties amounts not to an effort by the state to exercise <u>control over the sheriff</u> (at least not for all purposes) -- the factor relevant to the arm of the state inquiry -- but to ensure that the counties, as political subdivisions of the state, carry out some of the state's local business "in their respective counties." Fla. Stat. § 30.15(1), (2). <u>Cf.</u> <u>McMillan</u>, 520 U.S. at 791 (conceding that the fact that "the sheriff's jurisdiction is limited to the borders of his county" was one "important provision[] that cut in favor of the conclusion that sheriffs are county officials"). <u>But cf.</u> <u>id.</u> at 794 (observing that traditionally, in English government, the sheriff, "though limited in jurisdiction to his county and generally elected by county voters, was in reality an officer of the State, and ultimately represented the State in fulfilling his duty to keep the peace"). In short, the counties retain substantial discretion in determining which county office or official will actually be assigned these duties.

In addition, many of the functions assigned to the sheriff are carried out either at the sole discretion of the county or on behalf of the county. For example, the sheriff acts on behalf of the county when he fulfills his duty of executing the process of county courts and the board of county commissioners, Fla. Stat. § 30.15(1)(a), or when he attends terms of the county court, <u>id.</u> § 30.15(1)(c), or when he executes the orders of the board of county commissioners, <u>id.</u> §

23

30.15(1)(d). This last obligation -- to execute the orders of the board of county commissioners -- means little more than that if the board of county commissioners wants to direct the sheriff to do something, it may (and, in doing so, it must then pay the sheriff "such compensation, out of the county treasury, as [it] may deem proper," id.). Similarly, sheriffs must "at the will of the board of county commissioners, attend . . . all meetings of the boards of county commissioners of their respective counties, for which services they shall receive such compensation, out of the county treasury, as said boards may deem proper." Id. § 30.15(2) (emphasis added).

When carrying out some of these enumerated functions, the sheriff may well be acting as an arm of the state. For example, in a case involving a claim arising out of the sheriff's service of state process, id. § 30.15(1)(a), or his implementation of an antidiscrimination policy, id. § 30.15(3), a finding that the sheriff is entitled to the protection of the state's Eleventh Amendment immunity may be appropriate. However, our focus is necessarily on the function in which the sheriff was engaged when Abusaid's cause of action arose, not on the other functions he may carry out at other times.

In this case, Abusaid's claim arises out of the actions taken by the Sheriff in enforcing a Hillsborough County ordinance on behalf of the County. As we have

noted earlier, the County's Dance Hall Ordinance specifically provides that "[t]he Sheriff is responsible . . . for enforcing the Rave/Dance Hall Ordinance." Dance Hall Ordinance § 5(a)(2). And it was pursuant to this express grant of authority by the County that the Sheriff, acting on behalf of the County, enforced the Ordinance against Abusaid. As the Manders Court observed, "[t]he key question is not what arrest and force powers sheriffs have, but for whom sheriffs exercise that power." Manders, 338 F.3d at 1319 n.35 (emphasis in original). Simply put, this Court's function-by-function approach to Eleventh Amendment immunity compels the conclusion that the Sheriff cannot be deemed to be acting under the state's control when enforcing a local ordinance.

The third factor in our analysis -- the source of the sheriff's funding -- also weighs decisively in favor of the Hufford Court's conclusion that Florida sheriffs are not arms of the state. Just as when Hufford was decided, sheriffs' budgets still are funded entirely by county taxes. See id. at 1342; see also Jenne, 825 So. 2d at 416 ("Although the Sheriff performs many functions -- e.g., the Sheriff is responsible for serving process within the County -- his budget is made up by the County from taxes levied only within the County." (footnote omitted)). We find nothing in Florida law to suggest that the state contributes any money at all to its sheriffs, let alone that it funds "the particular function[] in issue" -- namely,

25

enforcement of county ordinances.[7]

Moreover, a sheriff is required to pay to the county any fees, commissions, or other money earned by his office, see Fla. Stat. § 30.51(5), again suggesting that he is financially accountable to the county. See Weaver v. Heidtman, 245 So. 2d 295, 297 (Fla. Dist. Ct. App. 1971) ("Under the present system all fees collected by the sheriff are deposited in the county treasury and the sheriff's budget is established independent of the fees collected, pursuant to the provisions of § 30.49.").

Nevertheless, as when Hufford was decided, the State of Florida retains an element of control over the Sheriff's funding in that (1) the sheriff may appeal the budget allocated to him by the county to a state administrative commission; and (2) the state sets the sheriff's salary. Florida law requires the sheriff to submit to the board of county commissioners "a proposed budget of expenditures for carrying out the powers, duties, and operations of office" each year. Fla. Stat. § 30.49(1); see also id. § 129.03(2) (requiring sheriff to submit budget as part of board of

[7]The Sheriff tries to make this argument, but the only provisions he cites in support of it are Fla. Stat. § 903.105, which states that sheriffs may use the bond posted by a defendant awaiting trial to apprehend the defendant if he fails to appear, and Fla. Stat. § 790.09, which authorizes the sheriff to retain custody of confiscated weapons until they are reclaimed by the owner or forfeited to the state.

county commissioners' preparation of county budget).[8]  The board of county commissioners or the county's budget commission "may amend, modify, increase, or reduce any or all items of expenditure in the proposed budget and shall approve such budget."  Fla. Stat. § 30.49(4).  The county does not, however, have final control over the sheriff's budget.  The Sheriff may appeal the county's decision to the Administration Commission, upon which the Executive Office of the Governor will hold a budget hearing and submit its recommendations to the Commission.  The Commission then may approve or amend the budget in part or as a whole. "The budget as approved, amended, or modified by the Administration Commission shall be final."  Id. § 30.49(5).  The county thereafter may not alter the appropriations made to the sheriff's office except upon request of the sheriff. Id. § 30.49(8).

The county must then pay out the sheriff's budget in monthly installments.

_____

[8]The sheriff must categorize all proposed expenditures as either (1) "General law enforcement"; (2) "Corrections and detention alternative facilities"; or (3) "Court services, excluding service of process."  Id. § 30.49(2)(a).  Within each of those categories, each expenditure must be itemized and classified as either (1) "Personal services"; (2) "Operating expenses"; (3) "Capital outlay"; (4) "Debt service"; or (5) "Nonoperating disbursements and contingency reserves."  Fla. Stat. § 30.49(2)(b).  The sheriff must also submit to the board "for consideration and inclusion in the county budget, as deemed appropriate by the county, requests for construction, repair, or capital improvement of county buildings operated or occupied by the sheriff."  Id. § 30.49(2)(c).  Section § 30.49's budget-setting procedures, however, "are not jurisdictional but are directory."  Weaver, 245 So. 2d at 297 (holding that board of county commissioners still had power to reduce sheriff's budget more than 31 days after it was submitted, even though § 30.49 provides for a 31-day limit).

Id. § 30.50(1). Any amount remaining at the end of the fiscal year "shall be refunded to the board of commissioners, and deposited to the county fund or funds from which payment was originally made." Id. § 30.50(6).

This residual control the state retains over the sheriffs' budgets, while not insignificant, leaves unaltered the fundamental fact that the sheriffs' funds are derived entirely from their respective counties. And our inquiry on this third prong of our arm of the state test asks what is the source of a sheriff's funds, not (as the second prong asks) what degree of control the state retains over the budgeting process. Thus, the consideration central to this third prong fairly weighs against arm of the state status.

Moreover, we think, even if state control over the budgeting process were the proper inquiry, this third factor would still weigh against arm of the state status. Neither the state's administrative review process for county budgeting decisions, nor its standardized salary provisions for county officials, alters the key facts that a sheriff is required to submit his budgets to the county for approval; a sheriff is financially accountable to his county and only to his county, since he must pay any money his office earns into the county treasury; and a county can avoid allocating any salary or budget to the sheriff by abolishing his office and assigning his duties elsewhere. Cf. McMillan, 520 U.S. at 791 (noting that the facts that sheriff's

28

salary was paid out of county treasury, county provided sheriff with equipment, sheriff's jurisdiction was limited to borders of his county, and sheriff was locally elected were "important provisions that cut in favor of the conclusion that sheriffs are county officials," but, in light of other factors, did not "tip the balance in favor of" concluding that sheriff was a county policymaker, since county had no authority to alter or refuse to pay sheriff's salary, or to deny funds to his operations). In short, the third factor points us toward the conclusion that the Sheriff is not an arm of the state.

The final factor in our arm of the state analysis -- whether the state's treasury would be burdened by an adverse verdict against the sheriff -- also weighs decidedly against arm of the state status.

In Hufford we found that "no provision of Florida law provides state funds to a Florida sheriff to satisfy a judgment against the sheriff," Hufford, 912 F.2d at 1342, and we can locate no such provision today. In fact, Florida law authorizes sheriffs to purchase liability insurance "to cover liability for damages arising out of claims for false arrests, false imprisonment, false or improper service of process, or other claims arising out of the performance of his or her duties or the duties of his or her deputies or employees," and to "pay the premiums for such insurance from funds appropriated for the necessary and regular expenses of office without

29

specific appropriation or specification of expenses with respect thereto." Fla. Stat. § 30.555. In addition, a county may require its sheriff to give bond, id. §§ 30.01, 30.02, and the "sureties, if any, are liable for all fines and amercements imposed upon the principal, or sheriff." Id. § 30.06.

The Sheriff's only argument about this factor is that state funds would be "implicated indirectly," since an adverse verdict would diminish the resources available to the Sheriff for law enforcement, "requiring state law enforcement to fill the gap." Answer Br. of Appellee at 19. This claim, while undoubtedly true, proves far too much, since a finding of Eleventh Amendment immunity in cases involving "indirect" burdens on state treasuries would require extending it to counties themselves, since a judgment against one of its counties is likely to have an even more substantial, albeit indirect impact on the state treasury. Moreover, the Eleventh Amendment's historical concern is much more precise -- it is with "judgments that must be paid out of a State's treasury," Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 48, 115 S. Ct. 394, 130 L. Ed. 2d 245 (1994), not with any judgment that may indirectly affect a state's finances. See id. at 50-51 (rejecting similar reasoning, since the Eleventh Amendment's "core concern" is with whether "the State [is] in fact obligated to bear and pay the resulting indebtedness").

Although the state is not liable for a judgment against a sheriff, the county appears not to be liable in all cases, either. For example, in <u>Broxson v. Donald S. Lavigne, Inc.</u>, 153 So. 2d 343 (Fla. Dist. Ct. App. 1963), a Florida court held that the sheriff was <u>personally</u> liable for goods he had ordered and had received, where all budgeted funds had been received by the sheriff's office but nevertheless he had not paid for the goods.

Nevertheless, counties certainly may be -- and have been -- held liable for a judgment against a sheriff. <u>See, e.g.</u>, <u>Lucas v. O'Loughlin</u>, 831 F.2d 232, 235 (11th Cir. 1987) (holding that county was liable for judgment against sheriff in § 1983 suit for wrongful termination since, based on the structure of the office of sheriff under Florida law, the "[sheriff's] act was the act of [the] County"); <u>see also</u> <u>Jenne</u>, 825 So. 2d at 416 ("[A]ny money judgment in this case will be paid from the local county budget or by insurance purchased therefrom by the Sheriff.").

Moreover, as we observed in <u>Hufford</u>, even if the county ultimately may not be held liable for a judgment against the sheriff, the fact that the state is not liable either weighs heavily against extending the state's Eleventh Amendment immunity to the challenged conduct by the sheriff. As <u>Hufford</u> said: "We have often stressed that the Eleventh Amendment is unlikely to protect an entity with 'fiscal autonomy.'" <u>Hufford</u>, 912 F.2d at 1342 (quoting <u>Fincher v. Fla. Dep't of Labor &</u>

31

Employment Sec., 798 F.2d 1371 (11th Cir. 1986)); see also Shands Teaching Hosp. & Clinics, Inc. v. Beech Street Corp., 208 F.3d 1308, 1311 (11th Cir. 2000) (noting that Eleventh Amendment immunity is appropriate "only to the extent that a judgment would expose the [state] government to financial liability").

As the Supreme Court explained in Edelman v. Jordan, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974), "'when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.' Thus the rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." Id. at 663 (citation omitted) (quoting Ford Motor Co. v. Dep't of Treasury, 323 U.S. 459, 464, 65 S. Ct. 347, 89 L. Ed. 389 (1945)); see also Regents of Univ. of Cal. v. Doe, 519 U.S. 425, 430-31, 117 S. Ct. 900, 137 L. Ed. 2d 55 (1997) (noting that "the question whether a money judgment against a state instrumentality or official would be enforceable against the State is of considerable importance to any evaluation of the relationship between the State and the entity or individual being sued," and admonishing against "detach[ing] the importance of a State's legal liability for judgments against a state agency from its moorings as an indicator of the relationship between

32

the State and its creation and to convert the inquiry into a formalistic question of ultimate financial liability"). Accordingly, the fact that a judgement against the Sheriff in this case would <u>not</u> be paid out of the state treasury is, in itself, a clear marker that the Sheriff is not an arm of the state. The fourth factor, like the preceding three, weighs against assigning the Sheriff arm of the state status.

Since all four factors in our analysis yield the conclusion that the Hillsborough County Sheriff does not act as an arm of the state in enforcing the County's Dance Hall Ordinance, we hold that the Sheriff is not entitled to the benefit of the State's Eleventh Amendment immunity from Abusaid's suit and, accordingly, reverse the district court's dismissal of the claims.

III.

The County also claims to be entitled to the benefit of the state's Eleventh Amendment immunity in this case. However, in so arguing, the County confuses the state law doctrine of sovereign immunity with the doctrine of Eleventh Amendment immunity governed by federal law and applicable only in federal court. The district court dismissed Abusaid's federal claims <u>only</u> on the ground of Eleventh Amendment immunity -- not Florida state law sovereign immunity. Order at 1 ("The plaintiff's claims under 42 U.S.C. § 1983 (counts one through fifteen) are barred by the doctrine of sovereign immunity pursuant to the Eleventh

33

Amendment."). Nevertheless, in dismissing Abusaid's § 1983 claims, the district court cited not only to Manders, but also to several Florida state court cases discussing Florida's sovereign immunity law. The confusion generated by these citations is compounded by the fact that some of the Florida case law, including one of the cases cited in the district court's order, Board of Regents v. Snyder, 826 So. 2d 382 (Fla. Dist. Ct. App. 2002), uses the term "arm of the state" to refer to state entities entitled to state law sovereign immunity. See, e.g., id. at 387. Consequently, the County, throughout its briefs, liberally intertwines the two doctrines.

Regardless of the confusion, controlling law makes it abundantly clear that the County enjoys neither Eleventh Amendment nor state law sovereign immunity. As to the former, it is by now well established that "[t]he bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations." Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977) (citation omitted). Accordingly, "the Court has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power.'" Hess, 513 U.S. at 43

34

(citation omitted); see also Hutton v. Strickland, 919 F.2d 1531, 1542 (11th Cir. 1990) ("This court specifically has recognized that the Eleventh Amendment does not prevent an award of damages against a county."). Eleventh Amendment immunity does not, therefore, bar Abusaid's federal claims against the County.

Nor does Florida's state sovereign immunity law bar Abusaid's § 1983 claims against the County. The Supreme Court made it absolutely clear in Howlett v. Rose, 496 U.S. 356, 110 S. Ct. 2430, 110 L. Ed. 2d 332 (1990), that Florida sovereign immunity law could not be invoked to shield a municipal entity from § 1983 liability. The Court explained:

> Since this Court has construed the word "person" in § 1983 to exclude States, neither a federal court nor a state court may entertain a § 1983 action against such a defendant. Conversely, since the Court has held that municipal corporations and similar governmental entities are "persons," see Monell v. New York City Dept. of Social Services, 436 U.S. 658, 663, 98 S. Ct. 2018, 2021-22, 56 L. Ed. 2d 611 (1978); cf. Will[v. Michigan Dep't of State Police, 491 U.S. 58, 69 n.9, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)]; Mt. Healthy City Bd. of Education v. Doyle, 429 U.S. 274, 280-281, 97 S. Ct. 568, 572-573, 50 L. Ed. 2d 471 (1977), a state court entertaining a § 1983 action must adhere to that interpretation. "Municipal defenses -- including an assertion of sovereign immunity -- to a federal right of action are, of course, controlled by federal law." Owen v. City of Independence, 445 U.S. [622, 647 n. 30, 100 S. Ct. 1398, 63 L. Ed. 2d 673 (1980)]. "By including municipalities within the class of 'persons' subject to liability for violations of the Federal Constitution and laws, Congress -- the supreme sovereign on matters of federal law -- abolished whatever vestige of the State's sovereign immunity the municipality possessed." Id., at 647-648, 100 S.Ct., at 1413-14 (footnote omitted).

Howlett, 496 U.S. at 376; accord Hufford, 912 F.2d at 1341 n.1.

Accordingly, even if the district court had dismissed Abusaid's federal claims on state sovereign immunity grounds as well as Eleventh Amendment immunity grounds, this dismissal would have been improper, since state sovereign immunity principles are no bar to § 1983 claims against a county. Thus, the County, like the Sheriff, is not immune from Abusaid's suit.[9]

_____

[9]The County also argues that the district court should have abstained from hearing this case under the abstention doctrine enunciated by the Supreme Court in Younger v. Harris, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971). This argument, however, is far off the mark. Younger abstention is the doctrine that federal courts should abstain from interfering with ongoing state criminal prosecutions. The Supreme Court has held unambiguously that when no state criminal proceedings are pending, the doctrine does not apply. Steffel v. Thompson, 415 U.S. 452, 462-63, 94 S. Ct. 1209, 39 L. Ed. 2d 505 (1974); accord For Your Eyes Alone, Inc. v. City of Columbus, 281 F.3d 1209, 1217 (11th Cir. 2002). It is undisputed in this case that no state criminal proceedings are ongoing. Abusaid has already been tried and convicted of violating the County's Dance Hall Ordinance, and none of the parties suggest that any charges remain pending against him. In a case such as this one -- where state criminal proceedings ended prior to the filing of the lawsuit -- "application . . . of Younger abstention [is] clearly erroneous." Ankenbrandt v. Richards, 504 U.S. 689, 705, 112 S. Ct. 2206, 119 L. Ed. 2d 468 (1992). Accordingly, the County's Younger argument is without merit.

The County also makes a patchwork of arguments that Abusaid's constitutional claims fail on the merits. Answer Br. of Appellees at 13-18. These arguments were not raised in the district court and are not appropriately before this Court, since the merits of Abusaid's claims have not yet been briefed or argued by the parties. See, e.g., Walton v. Johnson & Johnson Servs., 347 F.3d 1272, 1292-93 (11th Cir. 2003).

Finally, we raised sua sponte the issue of whether the doctrine of Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994), bars any or all of Abusaid's claims. Heck held that a state prisoner claiming that state officials had unconstitutionally secured his conviction by improperly investigating his crime and destroying evidence could not recover damages under § 1983 when his conviction had not previously been invalidated, since any recovery would necessarily imply the invalidity of his conviction. Heck set forth the principle that in such cases, the "district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint

36

must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." Id. at 487. Although the parties, at our request, submitted briefs on the issue of whether Heck bars any of Abusaid's claims, for several reasons we leave this question to be considered by the district court if properly raised by any party on remand.

For one thing, whether Heck applies to Abusaid's case at all raises a serious and substantial question that we offer the district court -- upon appropriate motion and full briefing by any of the parties -- the first opportunity to resolve. A brief review of the pertinent case law may be helpful. The Heck principle has its origins in Preiser v. Rodriguez, 411 U.S. 475, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973), which held that the sole remedy in federal court for a prisoner seeking restoration of good-time credits is a writ of habeas corpus. See id. at 500. The Court reasoned that such an action constitutes an attack on "the very duration of . . . physical confinement," and thus it lies at "the core of habeas corpus." Id. at 487-88. Subsequently, in Wolff v. McDonnell, 418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974), the Supreme Court reiterated that state prisoners must use habeas in seeking restoration of good-time credits, but held that an action challenging the validity of the procedures for revoking good-time credits, seeking damages and prospective relief, was properly brought under § 1983. See id. at 554-55.

The Supreme Court's post-Heck decision in Edwards v. Balisok, 520 U.S. 641, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997), limited the Wolff holding. In Balisok, the Court held that a state prisoner's challenge only to the procedures by which his good-time credits were revoked -- not to the revocation itself -- nevertheless necessarily implied the invalidity of the punishment imposed. Accordingly, the prisoner's claims for damages and declaratory relief had to be brought by way of habeas petition. However, his request for injunctive relief altering the challenged procedures prospectively, the Court held, was cognizable under § 1983, since generally "such prospective relief will not 'necessarily imply' the invalidity of a previous loss of good-time credits." Id. at 648.

Most recently, in Wilkinson v. Dotson, 125 S. Ct. 1242 (2005), the Supreme Court held that the claims of two state prisoners challenging the validity of state procedures for determining parole eligibility -- under which both prisoners were denied parole -- were properly brought under § 1983. The Court reasoned that because "neither prisoner's claim would necessarily spell speedier release, neither lies at 'the core of habeas corpus.'" Id. at 1246. Moreover, "the prisoners' claims for future relief . . . are yet more distant from that core." Id. at 1248. Accordingly, the Court held that "respondents' claims are cognizable under § 1983, i.e., they do not fall within the implicit habeas exception." Id.

This line of cases leaves open the question of whether Heck bars § 1983 suits by plaintiffs who are not in custody and thus for whom habeas relief is not available. All of these cases deal only with claims by state prisoners, and none clearly authorizes broader application of the Heck principle to bar claims by individuals not in custody. Moreover, Wilkinson's discussion of an "implicit habeas exception" suggests that Heck may create nothing more than

an exception to the availability of § 1983 relief in cases in which habeas provides a remedy.

Indeed, in Spencer v. Kemna, 523 U.S. 1, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998), five justices -- four concurring and one dissenting -- expressed the view that § 1983 claims are barred only when the alternative remedy of habeas relief is available. See id. at 990 (Souter, J., concurring, joined by O'Connor, Ginsburg, and Breyer, JJ.) ("The better view, then, is that a former prisoner, no longer 'in custody,' may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy."); id. at 992 n.8 (Stevens, J., dissenting) ("Given the Court's holding that petitioner does not have a remedy under the habeas statute, it is perfectly clear, as Justice Souter explains, that he may bring an action under § 1983."). Our Court has not yet weighed in on this issue, but at least two of our sister Circuits have adopted this view. See DeWalt v. Carter, 224 F.3d 607, 617-18 (7th Cir. 2000); Jenkins v. Haubert, 179 F.3d 19, 21 (2d Cir. 1999).

Abusaid's 60-day suspended jail sentence and 18-month probation term, imposed in September 2000, should now be long over. If this is the case, habeas relief is not available to him, and thus he may be entitled to bring a § 1983 suit. However, Abusaid argues that "based on this record, this Court cannot determine if habeas relief is available to Plaintiff," since "it is unclear whether Plaintiff was on probation at the time of filing his § 1983 action." Appellant's Letter Br. at 4 (citing Duvallon v. Florida, 691 F.2d 483, 485 (11th Cir. 1982), which held that a petitioner on probation met the "in custody" requirement for habeas relief). In addition, Abusaid argues that his arrest subsequent to filing this claim -- an occurrence not developed in the record -- may have some bearing on this issue. Appellant's Letter Br. at 4-5. These are fact-intensive issues properly resolved by the district court upon appropriate motion by one of the parties.

Moreover, whether any or all of the eighteen claims Abusaid has raised in his complaint necessarily imply the invalidity of his conviction or sentence also is a fact-specific question requiring careful review of these ambiguous allegations. Many, if not all, of Abusaid's federal claims appear to challenge the constitutionality of the ordinance under which Abusaid was convicted, and thus may be Heck-barred. However, we are mindful of the fact that Abusaid, who filed his complaint pro se (he is now represented by Court-appointed counsel), was less than perfectly clear in articulating the nature of his claims, which are substantially overlapping and in some instances poorly defined. Thus, if any party properly raises this issue on remand, the district court should have the first opportunity to discern which of Abusaid's claims necessarily imply the invalidity of his conviction or sentence. Because Abusaid is seeking prospective relief in addition to damages and declaratory relief, the district court will have to parse Abusaid's claims along these lines to determine whether, in light of Balisok and Wilkinson, some of his claims for injunctive relief might survive even if the corresponding claims for damages do not.

38

IV.

Because the Sheriff of Hillsborough County was not acting as an arm of the state in enforcing the Hillsborough County Dance Hall Ordinance against Abusaid, and because the Eleventh Amendment plainly does not immunize counties from suit in federal court, we reverse the district court's dismissal of Abusaid's claims against the Sheriff and the County as being barred by the Eleventh Amendment, and we remand for further proceedings consistent with this opinion.

REVERSED and REMANDED.