[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14297
Non-Argument Calendar
_____

D.C. Docket No. 7:13-cv-00028-HL

FELICIA PELLITTERI,

Plaintiff-Appellee,

versus

SHERIFF CHRIS PRINE,
Individually and in his official capacity as Sheriff of
Lowndes County, GA,

Defendant-Appellant,

LOWNDES COUNTY SHERIFF'S OFFICE, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(January 13, 2015)

Before MARTIN, JULIE CARNES and BLACK, Circuit Judges.

MARTIN, Circuit Judge:

Defendant Chris Prine, the Sheriff of Lowndes County, Georgia, appeals the District Court's denial of his motion to dismiss. On appeal, Sheriff Prine argues that Plaintiff Felicia Pellitteri's wrongful termination claims are barred by the Eleventh Amendment. We agree. As a result, we reverse and remand for proceedings consistent with this opinion.

## I.    BACKGROUND[1]

Ms. Pellitteri is a former deputy sheriff in the Lowndes County Sheriff's Office. After injuring her knee during the course of her duties, Ms. Pellitteri requested that she be placed on temporary light duty. According to Ms. Pellitteri, this was an accommodation that was routinely granted to other deputies who suffered on-the-job injuries. However, Ms. Pellitteri's request was denied, and she was eventually fired.

In March 2013, Ms. Pellitteri filed a complaint in federal district court against Lowndes County, the Lowndes County Sheriff's Office, and Sheriff Prine (in his individual capacity and official capacity as Sheriff of Lowndes County). In her complaint, Ms. Pellitteri alleged that the defendants violated her rights under

---

[1] We present the facts as alleged in Ms. Pelitteri's complaint. At this point in the litigation, we must assume the facts set forth in her complaint are true. See Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 453, 126 S. Ct. 1991, 1994 (2006) (stating that on a motion to dismiss, the court must "accept as true the factual allegations in the amended complaint").

2

42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12111, 12112.

Sheriff Prine then filed a motion to dismiss in which he argued that Ms. Pellitteri's § 1983 and ADA claims against him in his official capacity were barred by the Eleventh Amendment. The District Court denied Sheriff Prine's motion to dismiss, relying on this Court's unpublished opinion in Keene v. Prine, 477 F. App'x 575 (11th Cir. 2012) (per curiam). Sheriff Prine now appeals.

## II.    DISCUSSION

Sheriff Prine's primary argument on appeal is that the District Court erred when it denied him immunity under the Eleventh Amendment of the United States Constitution. According to Sheriff Prine, his law enforcement powers all derive from the State of Georgia, and the State has exclusive authority and control over the duties and affairs of his office. Thus, Sheriff Prine argues that he acts as an "arm of the State" when exercising his power to hire and fire the deputies that enforce the laws of Georgia on his behalf. We agree.

This Court reviews de novo the District Court's ruling regarding Eleventh Amendment immunity. Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs, 405 F.3d 1298, 1303 (11th Cir. 2005). "Eleventh Amendment immunity bars suits brought in federal court when the State itself is sued and when an 'arm of the State' is sued." Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc).

3

"To receive Eleventh Amendment immunity, a defendant need not be labeled a 'state officer' or 'state official,' but instead need only be acting as an 'arm of the State,' which includes agents and instrumentalities of the State." Id.

In making the "arm of the State" determination, we weigh the four factors set forth in Manders: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." Id. at 1309. Whether a defendant was acting as an "arm of the State" must be "assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." Id. at 1308; Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp., 208 F.3d 1308, 1311 (11th Cir. 2000) ("The pertinent inquiry is not into the nature of [an entity's] status in the abstract, but its function or role in a particular context."). As a result, we do not ask whether a sheriff in Georgia acts as an "arm of the State" generally. Rather, we must determine whether Sheriff Prine acts as an "arm of the State" when exercising his power to hire and fire his deputies.

A.    How State Law Defines the Entity

The first Manders factor—how state law defines the entity—points to viewing the Sheriff's Office as an "arm of the State." In Manders, we acknowledged that sheriffs in Georgia are elected by county voters and are labeled

4

"county officers" by the Georgia Constitution.  338 F.3d at 1312 (citing Ga. Const. art. IX, § 1, ¶ III(a)).  After reviewing Georgia law, however, we found that the "essential governmental nature" of each sheriff's office in Georgia is to (1) "enforce the law and preserve the peace on behalf of the sovereign State" and (2) "to perform specific statutory duties, directly assigned by the State, in law enforcement, in state courts, and in corrections."  Id. at 1319.  As a result, we concluded that sheriffs are only "county officers" in the sense that they have a limited geographic jurisdiction.  Id. at 1312.  Indeed, "sheriffs in Georgia derive their power and duties from the State, are controlled by the State, and counties cannot, and do not, delegate any law enforcement power or duties to sheriffs."  Id. at 1313; cf. O.C.G.A. 36-8-1(b) (allowing county governing bodies to create a separate county police force).

Beyond that, the Manders Court also observed that the Georgia Constitution designed the sheriff's office to enjoy a great deal of independence from the county that it serves.  338 F.3d at 1311.  While it is true that the State requires the county to fund the sheriff's budget, id., Georgia's Constitution also expressly prevents counties from controlling or affecting the sheriff's office or the personnel thereof, see Ga. Const. art. IX, § 2, ¶ I(c)(1) (providing that legislative power granted to counties "shall not be construed to extend to . . . [a]ction affecting any elective county office, the salaries thereof, or the personnel thereof, except the personnel

5

subject to the jurisdiction of the county governing authority"). The Georgia Constitution also grants the state legislature the exclusive authority to establish and control a sheriff's powers and duties. Ga. Const. art. IX, § 1, ¶ III(a)–(b). For this reason, the Georgia Supreme Court has explained that sheriffs cannot be considered county employees because they are subject only to the state legislature. Bd. of Comm'rs of Randolph Cnty. v. Wilson, 396 S.E.2d 903, 903 (Ga. 1990) ("The sheriff . . . is an elected, constitutional officer; he is subject to the charge of the General Assembly and is not an employee of the county commission.").

Turning to the specific function at issue here—hiring and firing deputies— the authority of sheriffs to employ personnel is also derived from the State. The Georgia legislature has enacted laws giving sheriffs alone the power to hire their deputies, independent of any influence from county governments. See O.C.G.A. § 15-16-23. Deputies are also considered employees of the sheriff and not the County. Warren v. Walton, 202 S.E.2d 405, 409 (Ga. 1973) (recognizing that "deputy sheriffs and deputy jailors are employees of the sheriff, whom the sheriffs alone are entitled to appoint or discharge") (quotation marks omitted); Brown v. Jackson, 470 S.E.2d 786, 787 (Ga. Ct. App. 1996) (noting that deputy sheriffs "were employees of the sheriff and not Peach County"). As a result, we conclude that the first Manders factor weighs in favor of immunity.

B.    Degree of Control the State Maintains Over the Entity

The second Manders factor is based on the "degree of control the State maintains over the entity." 338 F.3d at 1309. In Manders, for example, we were asked to determine whether sheriffs in Georgia act as an "arm of the State" when setting force policies at their jails and training and disciplining their deputies in that regard. Id. at 1308–09. On this factor, we found it significant that the State required sheriffs to attend annual trainings, and state law includes "corrections practices" as one of the topics for that training. Id. at 1320 (quoting O.C.G.A. § 15-16-3). We also observed that the Governor has broad investigation and suspension powers regarding any misconduct by sheriffs in the performance of their duties. Id. at 1321 (citing O.C.G.A. § 15-16-26). In the same way, we conclude that the State of Georgia exercises substantial control over a sheriff's personnel decisions, especially in the hiring and firing of deputies.

Admittedly, we stated in Keene that "sheriffs are largely independent from the State when they make personnel decisions." 477 F. App'x at 578. We arrived at this conclusion by observing that sheriffs alone have great discretion in choosing who to appoint as their deputies. Id. Based in part on this autonomy—both from the State and the county—we concluded that sheriffs do not act as an "arm of the State" when exercising their discretion to hire and fire deputies. Id. at 579–80.

Upon further review, however, we believe that this conclusion in <u>Keene</u> was mistaken on two fronts.  First, the State of Georgia has in fact exercised a great deal of control over the hiring and firing of deputy sheriffs, especially through the certification process for peace officers.  Georgia law requires that any person employed as a peace officer—including deputy sheriffs—be at least 18 years of age, be a citizen of the United States, have a high school diploma or its recognized equivalent, and not have a significant criminal record.  O.C.G.A. § 35-8-8(a)(1)–(4).  Any applicant for peace officer certification in Georgia must also be fingerprinted and undergo a moral character investigation, as well as a physical, emotional, and mental examination by a licensed physician or surgeon.  <u>Id.</u> § 35-8-8(a)(5)–(7).  And even after meeting all of these requirements, a potential deputy sheriff must still successfully complete an academy entrance examination administered by the State before he or she can be certified to serve in a sheriff's office as a deputy.  <u>Id.</u> § 35-8-8(a)(8).  These threshold requirements for serving as a peace officer in Georgia significantly limit a sheriff's discretion when hiring potential deputies.

The Georgia legislature has also enacted laws creating a Peace Officer Standards and Training Council to discipline peace officers—including deputy sheriffs—for misconduct.  <u>Id.</u> §§ 35-8-3, 35-8-7.1.  This Council has the power to administer reprimands and limit, suspend, or revoke a peace officer's certification.

8

Id. § 35-8-7.1(b)(1). Thus, the Council can functionally terminate a deputy sheriff's ability to perform his or her duties, which significantly restricts a sheriff's discretion in personnel matters.

Finally, as we mentioned in Manders, Georgia's governor also has broad investigation and suspension powers to discipline a sheriff for misconduct. 338 F.3d at 1321 (citing O.C.G.A. § 15-16-26). These disciplinary powers can be used to check sheriffs when they abuse their appointment or removal powers. Based on these facts, we conclude that Sheriff Prine's power to hire and fire his deputies is subject to a significant amount of oversight by the State.

Second, our conclusion in Keene was also flawed because it strayed from the "key question" of the Manders function-by-function inquiry, which "is not what . . . powers sheriffs have, but for whom sheriffs exercise that power." Abusaid, 405 F.3d at 1310 (quoting Manders, 338 F.3d at 1319 n.35). While it may be true that sheriffs alone are authorized to appoint their deputies, O.C.G.A. § 15-16-23, they do not exercise that authority for themselves. Rather, sheriffs select deputies to assist them in executing their own duties, which have been delegated to them by the State. See Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1333 (11th Cir. 2003) ("In enforcing the laws and conserving the peace, the Governor does not act alone, but necessarily acts through state agents such as sheriffs."); see also Teasley v. Freeman, 699 S.E.2d 39, 42 (Ga. Ct. App. 2010) ("[D]eputies serve as

9

the sheriff's agent, and deputies have no duties other than those of the sheriff."). In this sense, sheriffs exercise their power to hire deputies <u>for the State</u>. As a result, even if the State generally stays out of a sheriff's day-to-day decisions about who to hire or fire, the State still maintains a great deal of control. <u>See</u> <u>United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.</u>, 739 F.3d 598, 604 (11th Cir. 2014) ("That the District maintains some degree of autonomy over its day-to-day operations does not change the fact that the State of Florida ultimately retains near-total control over it."); <u>id.</u> (holding that the State maintains control because the entity "derives both the authority and the obligation to exercise those powers directly from the State"). We thus find that the second <u>Manders</u> factor also weighs in favor of immunity.

C.    Where the Entity Derives Its Funds

The third factor in the Eleventh Amendment analysis is where the entity derives its funds. In <u>Keene</u>, we found that this factor weighed against immunity because the "[c]ounty is clearly the principal source of funding for the Sheriff's Office, including for personnel expenditures." 477 F. App'x at 579. Here again, we recognize that our prior unpublished opinion is inconsistent with this Court's published precedent.

In <u>Manders</u>, we observed that each county in Georgia bears the major burden of providing funds to the sheriff's office, including the salaries of the sheriff and

10

his deputies.  338 F.3d at 1323.  We did not find this fact to be dispositive, however, because it is the State that mandates that counties set a budget for the sheriff's office.  Id. (citing O.C.G.A. §§ 36-9-5, 42-5-2(a), 15-16-20, 45-4-7).  More important, although each county sets the total budget for the sheriff's office, it cannot dictate how the sheriff spends those funds.  Id.; see McMillian v. Monroe Cnty., Ala., 520 U.S. 781, 791, 117 S. Ct. 1734, 1740 (1997) ("The county's payment of the sheriff's salary does not translate into control over [the sheriff], since the county neither has the authority to change his salary nor the discretion to refuse payment completely.").  Because Lowndes County funds the sheriff's department according to State law requirements, we cannot conclude that this factor weighs in favor of Eleventh Amendment immunity.  See Ross v. Jefferson Cnty. Dep't of Health, 701 F.3d 655, 660 (11th Cir. 2012) (per curiam) (holding that the source of funding for the Health Department does not "tip the balance against immunity because state law requires the county to supply those funds" (quotation omitted)).

D.    Liability for and Payment of Adverse Judgments

Fourth and finally, we consider "who is responsible for judgments against the entity."  Manders, 338 F.3d at 1309.  The Supreme Court has emphasized that the "impetus" for the Eleventh Amendment was the "prevention of federal-court judgments that must be paid out of a State's treasury."  Hess v. Port Auth. Trans-

11

Hudson Corp., 513 U.S. 30, 48, 115 S. Ct. 394, 404 (1994).  As a result, we have stated that "the presence of a state treasury drain alone may trigger Eleventh Amendment immunity and make consideration of the other factors unnecessary." Manders, 338 F.3d at 1328 n.51.[2]

On this factor, we agree with this Court's conclusion in Keene and Manders that the financial independence afforded the sheriff's office "creates something of a lacuna" because neither the State nor the County will be required to directly pay for any adverse judgment against the Sheriff's office.  Keene, 477 F. App'x. at 579; Manders, 338 F.3d at 1327.  Rather, any adverse judgment against Sheriff Prine will be paid out of the budget of the Lowndes County Sheriff's Office, which is composed of both County and State funds.  Manders, 338 F.3d at 1327. Nevertheless, to the extent that the state treasury will be spared here from paying any adverse judgment, this factor weighs in favor of denying immunity.  See Abusaid, 405 F.3d at 1313 ("[T]he fact that a judgment against the Sheriff in this case would not be paid out of the state treasury is, in itself, a clear marker that the Sheriff is not an arm of the state.").

---

[2] We pause to note, however, that the fourth Manders factor alone is not necessarily dispositive in any given case.  Indeed, our precedent suggests that the presence of a state treasury drain is likely sufficient but certainly not necessary for a finding of immunity.  See Manders, 338 F.3d at 1327 ("Never has the Supreme Court required an actual drain on the state treasury as a per se condition of Eleventh Amendment immunity."); Ross, 701 F.3d at 660 ("As to the fourth factor, our precedent holds that liability by the state treasury is not determinative of whether a governmental entity should enjoy Eleventh Amendment immunity.").

12

III.    CONCLUSION

As in <u>Manders</u>, the first three factors here weigh in favor of immunity, while the fourth factor weighs against immunity.  On balance, we conclude that Sheriff Prine enjoys Eleventh Amendment immunity against Ms. Pellitteri's wrongful termination claims brought against him in his official capacity under § 1983 and the ADA.  We reverse the District Court's denial of Sheriff Prine's motion to dismiss and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**