PARKER, Circuit Judge,
dissenting:
In Manders v. Lee, this Court, applying a four part test, held that a Georgia sheriff acts as an arm of the State and is therefore entitled to Eleventh-Amendment immunity when he establishes use-of-force policy at the county jail and trains and disciplines his deputies in that regard. 338 F.3d 1304 (11th Cir. 2003) (en banc) (6-5 decision). The Court was careful to qualify, however, that it was not resolving whether a sheriff acts on behalf of the State for all purposes vis-á-vis the county jail, and it clearly distinguished the provision of food, clothing, and medical care to inmates on the ground that O.C.G.A. § 42-5-2 places the responsibility to furnish such necessities on the counties. See id. at 1319, 1322-23 & n.43.
Notwithstanding those admonitions, the majority holds that a Georgia deputy sheriff acts on behalf of the State and is thus immune from liability for failing to provide food to inmates in the county jail. The majority reaches that conclusion based largely on its view that § 42-5-2- does not impose a duty on the counties, even though, as Manders recognized, the Georgia Court of Appeals has construed the statute to do just that. The majority then proceeds to an inappropriate application of the Manders factors while losing sight of the principal purpose behind the Eleventh Amendment—not implicated here—of protecting the State’s purse from federal-court judgments absent consent to suit. The result is a decision that significantly expands the reach of sovereign immunity and will leave Georgia counties unanswerable for constitutional violations predicated on their failure to provide food or any of the other necessities required by § 42-5-2. Because I believe that such an outcome is neither correct as a matter of law nor wise, I respectfully dissent.
The first factor under Manders asks how state law defines the entity with respect to the particular function. Id. at 1319. In Manders, the Court concluded that Georgia law defines the sheriff as a state actor with respect to force policy in the county jail because his authority to use force and his obligation to administer the jail “are directly derived from the state and not delegated through the county entity.” Id. “While we must consider context,” the Court continued, the fact that the actions took place within the county jail did not “automatically transmute” them into county functions because they involved “quintessential policing function[s]” that extended beyond the jail:
[I]n administering the jail, the sheriff does not check his arrest powers or force authority at the door. Instead, he and his deputies bring them into the jail and exercise them in the jail setting. This case is not a case of feeding, clothing, or providing medical care to inmates, which necessarily occur within the jail. Instead, it involves Sheriff Peterson’s force policy, which happens to be at issue in the jail context in. this particular case.
Id. (emphasis added). The first factor thus weighed heavily in favor of immunity. Id.
Here, the particular function is the 'provision of food to inmates in the county jail. As noted, that function is addressed in § 42-5-2, which provides that “it shall be the responsibility of the governmental unit, subdivision, or agency having the physical *1344 custody of an inmate to maintain the inmate, furnishing him with food, clothing, and any needed medical and hospital attention.” The Georgia Court of Appeals has long understood this section to require counties, as the governmental units having physical custody of inmates in the county jail, to ensure that they are provided with those necessities. See, e.g., Tattnall County v. Armstrong, 333 Ga.App. 46, 775 S.E.2d 573, 577 (2015) (en banc), overruled on other grounds by Rivera v. Washington, 298 Ga. 770, 784 S.E.2d 775 (2016) (“OCGA § 42-5-2(a) imposes upon the county the duty and cost of medical care for inmates in its custody” at the county jail); Epps v. Gwinnett County, 231 Ga.App. 664, 499 S.E.2d 657, 663 (1998); Cherokee County v. North Cobb Surgical Assocs., P.C., 221 Ga.App. 496, 471 S.E.2d 561, 563-64 (1996); Macon-Bibb Cty. Hosp. Auth. v. Houston County, 207 Ga.App. 530, 428 S.E.2d 374, 375-76 (1993). Indeed, the Court of Appeals has specifically held that § 42-5-2 imposed a duty on Cobb County to provide medical care to inmates at the Cobb County Adult Detention Center. Graham v. Cobb County, 316 Ga.App. 738, 730 S.E.2d 439, 440-41 (2012). Relying on such decisions, the Manders court “stress[ed]” that it was not dealing with a case involving the denial of medical care, “which counties have a statutory obligation to provide to inmates in county jails.” 338 F.3d at 1323 n.43; see also Manders, 338 F.3d at 1337 n.6 (Barkett, J., dissenting) (“The majority recognizes that counties may be liable for constitutional deprivations arising out of certain aspects of jail administration.”) (citing 338 F.3d at 1322, 1323 & n.43).
Although the Manders court had no occasion to resolve whether Georgia law defines the sheriff as a state or county actor with respect to the provision of food to county jail inmates, the answer is apparent from its focus on delegation and context. Unlike the force policy, the responsibility of providing food falls directly on the county as the entity having physical custody over the inmates. While the sheriff is responsible for carrying that function out, he does so on the county’s behalf as the county jailer, pursuant to a delegation of its responsibilities. See O.C.G.A. § 42-4-4 (“By virtue of their offices, sheriffs are jailers of the counties.... ”). That is, after all, why the Georgia courts have held counties responsible under § 42-5-2 for the actions of the sheriff and his deputies in the county jail.[1] Further, unlike the force policy, which happened to be at issue in the jail context in Manders but commonly arises in other circumstances, the provision of food to inmates takes place almost exclusively within the jail,[2] These two factors strongly suggest that state law de *1345 fines the provision of food to inmates in the county jail as a county function; They also explain why the Court in Manders was so insistent on distinguishing the provision of the necessities described in § 42-6-2 from the force policy, and why the Georgia federal district courts have overwhelmingly held that a sheriff performs a county function and is thus not entitled to immunity from liability for failing to provide medical care to inmates in the county jail. See Robinson v. Integrative Detention Health Servs., Inc., 2014 WL 1314947, at *12 & n.148 (M.D. Ga. Mar. 28, 2014) (collecting cases).
The majority appears to recognize that § 42-5-2, so read, presents a substantial obstacle to immunity. But it concludes that because § 42—4—4(a)(1) “requires the sheriff to ‘take ... physical custody of the jail and the bodies of such persons as are confined therein,’ ” the sheriff is the “governmental unit” having physical custody of the inmates under § 42-5-2. Maj. Op. at 1340. But this conclusion is foreclosed by Georgia law: The Georgia Court of Appeals has construed § 42-5-2 to impose a responsibility on counties to provide food, clothing, and medical care to inmates in the county jail, which makes sense only if the counties are the “governmental units” upon whom that responsibility falls. Because I see no basis to conclude that the Georgia Supreme Court would interpret the statute differently, we are bound by the Court of Appeals’s construction. See Molinos Valle Del Cibao, C. por A. v. Lama, 633 F.3d 1330, 1348 (11th Cir. 2011).
The majority offers two additional grounds for concluding that the first factor favors immunity, neither of which, in my view, is sufficient to overcome the force of the text of § 42-5-2. First, the majority cites § 42-4-32, which requires the sheriff to feed inmates and ensure that food preparation and service conform to state standards, and reasons that the imposition of such duties “directly on the sheriff ... and not on the county in which ■ the jail is located” is- “evidence that the provision of food is a state function.” Maj. Op. at 1340. While I agree that § 42-4-32 places a duty on the sheriff to furnish food to inmates in his care, that does not tell us whether the sheriff acts on behalf of the State or the county when doing so. Section 42-5-2 does. Instead of construing § 42-4-32’s silence to mean that the sheriff acts on behalf of the State, I would read the sections harmoniously to provide that the sheriff acts on behalf of the county. To the extent that doubt remains, context is again instructive: Because the function, with limited exceptions, occurs within the jail, the sheriff is best understood as acting on behalf of the county.
The majority also observes that “counties lack supervisory authority and ‘delegate no powers or duties to sheriffs,’ ” and that'Georgia courts have interpreted § 42-5-2 to require counties to fund the provision of medical care but give the sheriff exclusive control over selecting a provider. Maj. Op. at 1341 (quoting Manders, 338 F.3d at 1319). Control, however, is addressed by the second factor: the first asks how state law defines the function, and under Manders that question is answered by considering delegation and context. Cf. Manders, 338 F.3d at 1319 n.35 (“The key question is not what arrest and force powers sheriffs have, but for whom sheriffs exercise that power.”). The two factors *1346 should not be collapsed.[3] And while the Manders court did state that counties “delegate no powers or duties to sheriffs,” the particular issue was whether they “delegate any law enforcement powers or duties to sheriffs,” as the functions related to force policy. 338 F.3d at 1313 (emphases added). Outside of that specific context, Manders offers no guidance, and I would not read its dictum in a manner that conflicts with Georgia case law providing that §. 42-5-2 imposes .a duty on the counties that is carried out by sheriffs on their behalf.
In sum, because the task of providing food to inmates in the county’s physical custody is assigned by statute to the county and is generally limited to the county jail, and because the alternative sources of state law do not clearly indicate that the sheriff acts for the State, I would hold that state law defines the function of providing food to inmates in the county’s custody as a county function. Accordingly, I would find that the first factor weighs heavily against immunity.
Turning to the second factor—where state law vests control with respect to the particular function—I agree with the majority that the State’s requirement in § 42-4-32(a) that food preparation and service conform to the Department of Public Health’s standards, coupled with the counties’ apparent lack of control, weighs in favor of immunity. Maj. Op. at 1342. But control is of limited relevance to the Eleventh Amendment analysis where, as here, “[[Indicators of immunity or the absence thereof do not ... all point the same way,” since “ultimate control of every state-created entity resides with the State” and “rendering control dispositive does not home in on the impetus for the Eleventh Amendment: the prevention of federal-court judgments that must be paid out of the State’s treasury.” Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 44, 47-48, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). That issue is instead addressed by the third and fourth Manders factors and the dual purposes underlying immunity, each of which, as I explain below, weighs against or at least does not favor immunity.
The third factor is the source of funding for the particular function at issue. In Manders, the Court observed that “[t]he State funds the annual training of sheriffs” and it was “reasonable to assume that such training includes instruction on force policy and hiring and training deputies.” 338 F.3d at 1320, 1323. The State also funded “the Governor’s disciplinary procedure over sheriffs for use of excessive force” and paid “for certain state offenders assigned to the county jails under the sheriffs supervision.” Id. at 1323. The Court went on to note that although the county bore the “major burden of funding [the sheriffs office] and the jail, it [was] because the State so mandates,”' and the county lacked control over how the sheriff spent his budget. Id. Because the county did not exercise any power of the purse with respect to the particular functions and because “both state and county funds [were] involved” in those functions, the Court concluded that the State’s involvement was “sufficient to tilt the third factor ... toward immunity.” Id. at 1324.
The majority determines that the application of the third factor is “indistinguish *1347 able from the application in Manders” because “[t]he state pays for some of the operations of the sheriffs office and the county bears the major burden of funding [the sheriffs] office ... because the State so mandates.” Maj. Op. at 1344.1 disagree. Under the majority’s formulation, it is hard to imagine when this factor would not favor immunity, as the State always pays for some of a sheriffs operations. The Manders court took a more nuanced approach, focusing on the involvement of state funds in the particular functions relating to force policy, and found that the State’s contributions to annual training, disciplinary procedure, and the housing of certain state offenders were enough to tilt the factor toward immunity. Here, the State, through § 42-5-2, has expressly delegated to the counties the responsibility providing-by paying for-food to inmates. The absence of state funds for the particular function disfavors immunity. See, e.g., Abusaid v. Hillsborough Cty. Bd. of Cty. Com’rs, 405 F.3d 1298, 1310 (11th Cir. 2005). It is presumably for this reason that in analyzing the third factor, the Manders court qualified that Manders “had not allege[d] that Sheriff Peterson denied him necessities in § 42-5-2” but rather had “challenged only Sheriff Peterson’s force policy at the jail and the training and disciplining of his deputies.” 338 F.3d at 1323 & n.43.[4] Unlike Manders, Lake alleges precisely that. I would therefore find that this factor tilts against immunity.
The fourth factor asks what is the source of the funds that would pay for an adverse judgment. The majority, following Manders, concludes that “[a]t a minimum, this final factor does not defeat immunity,” because although the State is not directly responsible for a judgment against the sheriff, any decrease in the sheriffs budget would indirectly impact both state and county funds, and “the State’s sovereignty and thus its integrity remain directly affected when federal court lawsuits interfere with a state program or function.” Maj. Op. at 1344 (quoting Manders, 338 F.3d at 1329). Since Manders, however, the Court has twice rejected ‘the theory that an indirect impact on the State treasury favors immunity and has instead held that “the fact that a judgment .against the Sheriff in this case would not be paid out of the state treasury is, in itself, a clear marker that the Sheriff is not an arm of the state.” Abusaid, 405 F.3d at 1313; see also Pellitteri v. Prine, 776 F.3d 777, 783 (11th Cir. 2015) (“[T]o the extent that the state treasury will be spared here from paying any adverse judgment, this factor weighs in favor of denying immunity.”) (citing Abusaid, 405 F.3d at 1313).
Moreover, the Manders court itself ultimately relied not on the indirect-impact theory, but on the fact that lawsuits based on the sheriffs force policy would offend the State’s dignity by interfering with what was, according to the remaining factors, a state function. See 338 F.3d at 1327-28 & n.51 (observing that “the United States Supreme Court has never said that the absence of a treasury factor alone *1348 defeats immunity and precludes consideration of other factors, such as how state law defines the' entity or what degree of control the State has over the entity,”- and that “[t]he State’s ‘integrity’ is not limited to who foots the bill”). Manders is best read, therefore, to stand for the proposition that the absence of a direct impact on the State treasury does not preclude immunity where the remaining factors indicate that a state function is at issue. Here, because two of the remaining factors indicate that we are' dealing with a county function and the. other is of minimal relevance, this factor arguably tilts against immunity. In any event, as the majority acknowledges, this factor cannot support immunity. See Maj. Op. at 1343^44.
To recapitulate, the first Manders factor weighs heavily against immunity. The third and possibly fourth point in the same direction. And while, the second factor favors immunity, it is of limited relevance where the factors conflict. I would accordingly hold that a Georgia deputy sheriff is not entitled to immunity for failing to provide food to inmates in the county jail. This should come as little surprise, given the Manders court’s repeated observation that the provision of food, clothing, and medical care are materially different for purposes of immunity from the force policy functions.[5]
To the extent that the Manders factors are not conclusive, however, “the Eleventh Amendment’s twin reasons for being remain our prime guide,” Hess, 513 U.S. at 47, 115 S.Ct. 394, and they too weigh against immunity. The first factor is to ensure that we do not offend Georgia’s dignity as a sovereign by allowing sheriffs to be sued in federal courts. Id. As noted, the Georgia Court of Appeals has held that a county is responsible for the sheriffs failure to comply with § 42-5-2 because the sheriff acts on the county’s behalf, ie., as an arm of the county. See supra at 1345-46. Indeed, while the Georgia courts have said that a county cannot be held liable for violating § 42-5-2 because the statute does not waive sovereign immunity as a matter of state law, they have added that “this does not mean that plaintiffs seeking recourse based on allegations that a government denied or provided inadequate medical treatment to an inmate are necessarily without recourse because such claims may in some circumstances state a cause of action under 42 U.S.C. § 1983.” Armstrong, 775 S.E.2d at 578 n.10. Thus, not only do we not offend Georgia’s dignity by permitting suit in these circumstances, Georgia expects that § 1983 liability would be available to hold sheriffs and counties accountable. “It would be every bit as much an affront to [Georgia’s] dignity” to *1349 ignore those decisions and conclude that the sheriff and his deputies act for the State and are immune from liability for such actions. See Fresenius Medical Care Cardiovascular Res., Inc. v. Puerto Rico & Caribbean Cardiovascular Ctr. Corp., 322 F.3d 56, 63-66 (1st Cir. 2003).
The second purpose of immunity, which is the “most important,” is to prevent federal-court judgments that would necessarily be paid out of the State’s treasury absent consent to suit. Hess, 513 U.S. at 47-48, 115 S.Ct. 394. As Manders recognized, a federal judgment would have no direct impact on Georgia’s treasury because it would be paid out of the budget of the sheriffs office, which as previously noted, comes from the county funds. 338 F.3d at 1327. While this fact does not necessarily defeat immunity, e.g., Pellitteri, 776 F.3d at 782 n.2, it certainly weighs against it, see Hess, 513 U.S. at 51, 115 S.Ct. 394 (observing that “the Eleventh Amendment’s core concern is not implicated” when “both legally and practically” the State is not “in fact obligated to bear and pay the resulting indebtedness of the enterprise”) (emphasis added). And even if an indirect impact on the State treasury could theoretically support immunity, which is questionable, see Abusaid, 405 F.3d at 1312, that impact is too remote and speculative here because it is the counties who ultimately bear the responsibility for ensuring that the sheriff is adequately funded to perform his duties. E.g., Chaffin v. Calhoun, 262 Ga. 202, 415 S.E.2d 906, 907-08 (1992). Both purposes, then, weigh against immunity.
For all of these reasons, I would hold that a Georgia deputy sheriff is not entitled to immunity from liability for failing to provide food to inmates at the county jail, and I would affirm the decision of the district court. I therefore respectfully dissent.

. I say almost exclusively because the Georgia courts have held that a person may be an “inmate” in the physical custody of the county even though he was not physically in the *1345 jail at the time of his injury. See, e.g., North Cobb Surgical Assocs., 471 S.E.2d at 563-64.

. For the same reason, I fail to see the relevance of the principle of Georgia law that the . powers of county commissioners are .to be strictly limited and construed. See Maj. Op. at 1342. The question for purposes of the first factor is not whether the county has authority or control over the sheriff’s actions, but whether it bears responsibility for them.

. I acknowledge that here, as in Manders, the State pays "for certain state offenders as- ' signed to county jails under the sheriff’s supervision.” 338 F.3d at 1323. However, because the Court rejected as too broad the dissent’s characterization of the function as . "jail operation,” id. at 1309 n.9, the fact that the State also funded training and disciplining related to force policy was critical to the Court’s analysis of the third factor, and comparable funding is absent in this case. Were the State’s mere payment for certain offenders assigned to the county jail enough to shift this factor toward immunity, the instruction that we assess the particular function—the provision of food to inmates in the county jail—would be rendered hollow.

. The extent of the majority's discussion on these statements is to "acknowledge that we reserved judgment in Manders about 'a 'case of feeding inmates, which necessarily occurs within the jail,’ ” but note that "we also observed that Georgia law ‘regulates the preparation, service, and number of meals,’ which we called 'evidence of how the duties of sheriffs in Georgia are governed by the State and not by county governing bodies.’ ’’ Maj. Op. at 1344 (quoting Manders, 338 F.3d at 1317 n.30, 1319) (alterations adopted). That statement, however, appeared in the Court’s preliminary overview of Georgia law and was followed by the caveat that "[w]e do not contend that these statutory jail duties, by themselves, transform sheriffs into state officials.” 338 F.3d at 1317 n.30. Regardless, while § 42-4-32(a) shows that the State controls the function at issue, that is a quite different question from how the State defines the function, which is answered by § 42-5-2 and the context in which the function occurs. That is likely why, despite this single reference to § 42-4-32(a), the Manders court noted on four separate occasions that the case did not involve food, clothing, or medical care and thus did not implicate § 42-5-2.