[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-15496
Non-Argument Calendar
_____

D.C. Docket No. 3:14-cv-00045-CDL

GLORIA JANE MILLER,

Plaintiff - Appellee,

versus

ADVANTAGE BEHAVIORAL HEALTH SYSTEMS,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(January 26, 2017)

Before WILSON, ROSENBAUM, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Plaintiff Gloria Jane Miller alleges that Defendant Advantage Behavioral Health Systems terminated her employment because of her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). Advantage, a Georgia "community service board," moved to dismiss on grounds of Eleventh Amendment immunity. The district court denied Advantage's motion, finding that Advantage is not an "arm of the State" for federal sovereign immunity purposes with respect to Miller's suit. Advantage appeals from the district court's denial. We affirm.

## BACKGROUND

Advantage is a community service board ("CSB") providing mental health, substance abuse, and developmental disability services in the State of Georgia. CSBs are creatures of Georgia state law, *see generally* O.C.G.A. § 37-2-6, and may receive funding from the State to support their services. While they are subject to some high-level oversight by Georgia's Department of Behavioral Health and Developmental Disabilities (the "DBHDD"), daily operations and personnel

2

matters are managed by locally elected boards and supporting staff. *See* O.C.G.A. § 37-2-6(a)–(b).

Miller worked as a nurse at Advantage for several years until her employment was terminated in 2010. Miller contends that Advantage discriminated against her and ultimately fired her as a result of her age. She filed suit against Advantage under the ADEA in the United States District Court for the Middle District of Georgia in 2014. After a year of discovery, and on the eve of the parties' pretrial conference, Advantage moved to dismiss the suit on grounds of Eleventh Amendment immunity. The district court made note of the "perplexing" tardiness of Advantage's motion but declined to find that Advantage had waived its right to assert a federal immunity defense. The court proceeded to reject Advantage's argument that it qualifies as an "arm of the State" for Eleventh Amendment purposes and denied Advantage's motion to dismiss. We affirm.

## STANDARD OF REVIEW

We review the district court's denial of Advantage's sovereign immunity defense *de novo*. *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1290 (11th Cir. 2003). We may affirm the district court's decision on any ground supported by the record. *Ironworkers Local Union 68 v. AstraZeneca*

3

*Pharm., LP*, 634 F.3d 1352, 1360 (11th Cir. 2011).

## DISCUSSION

### I.    Eleventh Amendment Immunity

The Eleventh Amendment to the federal Constitution "protects a State from being sued in federal court without the State's consent." *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc).[1]  Eleventh Amendment immunity extends to "arms of the State," or public entities acting as state agents or instrumentalities. *Id*.

A defendant's status as an arm of the State "must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." *Id.*; *see also Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 208 F.3d 1308, 1311 (11th Cir. 2000) (establishing that arm-of-the-State status relates not to the entity's "status in the abstract" but to its "function or role in a particular context.").

---

[1]  It is well settled that Congress did not properly abrogate the states' Eleventh Amendment immunity with respect to age-discrimination claims in enacting the ADEA. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 66–67 (2000); *Stroud v. McIntosh*, 722 F.3d 1294, 1303 (11th Cir. 2013) ("The Supreme Court has made it clear that the ADEA is unconstitutional as applied to the states . . . .").  Accordingly, there is no dispute in this appeal that Advantage would be entitled to immunity from Miller's ADEA claim if Advantage were deemed to have acted as an arm of the State when it terminated Miller.

4

Once the relevant context is defined, this Court balances four factors (the "*Manders* factors") to determine whether the defendant acted as an arm of the State: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Manders*, 338 F.3d at 1309. The entity invoking Eleventh Amendment immunity bears the burden of demonstrating that the *Manders* factors weigh in its favor. *See, e.g.*, *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006) (joining its sister circuits to hold that an entity seeking refuge in the Eleventh Amendment "bears the burden of demonstrating that it qualifies as an arm of the state").

Miller's ADEA discrimination claim arises from her allegedly wrongful termination by Advantage. As such, the question presented is whether Advantage acts as an arm of the State in making hiring and firing decisions in the ordinary course of business. With this context in mind, we review *de novo* Advantage's arguments as to each of the four *Manders* factors. We find that, under the evidence Advantage presents, three of the four factors weigh against finding immunity with respect to Miller's claim.

5

### A.    Georgia Law's Definition of Community Service Boards

The first *Manders* factor considers how Georgia law defines CSBs.  As we have noted, "federal law, not state law, [ ] ultimately governs whether an entity is immune under the Eleventh Amendment," *Lightfoot v. Henry County School District*, 771 F.3d 764, 771 (11th Cir. 2014), but the manner in which state law treats a public entity serves to guide our Eleventh Amendment analysis.  *See id.* at 769–71 (considering Georgia statutory framework, Georgia constitution, and related state case law to assess first *Manders* factor).

We first consider the language with which the relevant Georgia statute characterizes CSBs.  The opening section of the CSB enabling statute states that the entities "shall be considered public agencies" and that each individual CSB "shall be a public corporation and an instrumentality of the state."  O.C.G.A. § 37-2-6(a).  While the terms "public agency" and "public corporation" are too vague to tip the balance toward arm-of-the-State status, entities considered "instrumentalities" of the State presumptively share in the State's Eleventh Amendment immunity.  *See Manders*, 338 F.3d at 1308 (noting that the phrase "arm of the State" encompasses "agents and instrumentalities of the State").

6

The Georgia legislature, however, clouded this presumption later in the same statutory section by declaring that CSBs "shall not be considered agencies of the state" and shall "have the same immunity as provided for counties." O.C.G.A. § 37-2-11.1(c)(1). Georgia law—unlike federal law—grants counties sovereign immunity along with state agencies, but it defines county immunity and state-agency immunity differently. *Compare Stewart v. Baldwin Cty. Bd. of Educ.*, 908 F.2d 1499, 1509 (11th Cir. 1990) (noting that Eleventh Amendment immunity "does not extend to counties") *with Toombs Cty., Ga. v. O'Neal*, 330 S.E.2d 95, 97 (Ga. 1985) (holding that sovereign immunity under Georgia constitution "is extended to the counties of the State of Georgia" but that state legislature may waive that immunity by law). This provision thus runs counter to the statute's opening language, suggesting that the legislature intended CSBs to function as analogues of counties even if the statute nominally deemed them state "instrumentalities."

At best, the plain language of the relevant statutory provisions cuts only weakly in favor of finding that Georgia law views CSBs as arms of the State. And because Georgia law grants immunity to counties as well as state agencies, we

7

cannot easily import its statutory language into a federal immunity framework that draws a sharp distinction between these two types of entities.

Georgia case law helps clarify this picture. In *Youngblood v. Gwinnett Rockdale Newton Cmty. Serv. Bd.*, 545 S.E.2d 875 (Ga. 2001), the Georgia Supreme Court unambiguously held that CSBs are arms of the State for purposes of state constitutional immunity, looking beyond the statutory language to find that the Georgia legislature designed CSBs to function as state entities rather than as independent political subdivisions. *Id*. at 877 & n.2. The legal effect of *Youngblood* was to invalidate the statutory provision that purported to grant CSBs "the same immunity as provided for counties." O.C.G.A. § 37-2-11.1(c)(1). The effect of *Youngblood* in our analysis is to tip the balance toward a finding that Georgia state law views CSBs like Advantage as arms of the State.[2]

---

[2] Advantage makes a broader inference: "[W]hen the court in *Youngblood* ruled that CSBs are the 'state' for the purpose of suit under [Georgia law], it was necessarily holding that . . . the State of Georgia considers them to be entitled to Eleventh Amendment immunity." Advantage's reading of *Youngblood* goes too far. The court made no assertions as to the status of Georgia's CSBs under the Eleventh Amendment, and indeed the court had no occasion in that case to opine about federal immunity law. And as the Georgia Supreme Court has acknowledged, state immunity analysis need not align with federal immunity analysis. *Hines v. Ga. Ports Auth.*, 604 S.E.2d 189, 195 (Ga. 2004). Furthermore, the first *Manders* factor asks us to consider whether state law treats an entity more like a state agency or more like a political subdivision—it does not require us to discern how state courts believe federal courts should treat the entity under the Eleventh Amendment. Our conclusion on the first *Manders* factor is, therefore, narrow: In light

Because the Georgia Supreme Court's classification of CSBs as state agencies is clear and definitive, we reserve our analysis of the practical function of CSBs under the state's statutory scheme for the remaining *Manders* factors.

## B.    Where Georgia Law Vests Control

The second *Manders* factor requires us to determine the degree of control the State maintains over the activity from which the defendant's alleged liability arises.  The question in this case is whether the State of Georgia exercises meaningful control over Advantage's hiring and firing practices in the ordinary course of business.  We find that it does not.

As a general matter, CSBs in Georgia are managed at the local level and without significant state involvement.  The operations of each CSB are controlled by a local Governing Board, whose members are appointed by authorities of the communities the CSB serves.  *See* O.C.G.A. § 37-2-6(b).  While state law defines the mechanism by which Board members are appointed and provides guidance regarding the selection of members, the State is not entitled to oversee or control

---

of *Youngblood*, Georgia state law views CSBs as state agencies entitled to immunity under state law.

9

the appointment process in any capacity.  *See* O.C.G.A. § 37-2-6(b)(1) (outlining

Board appointment process); O.C.G.A. § 37-2-6(c) (encouraging local authorities

to ensure diversity in Board membership).

The Governing Board is, in turn, empowered to appoint an Executive

Director to "direct[] the day-to-day operations" of the CSB.  The Board may

delegate "any power, authority, duty, or function" to the Director or other CSB

staff members as it deems appropriate.  O.C.G.A. § 37-2-6.1(a)(1).  Appointment

and compensation of the Executive Director are subject to approval by the

Commissioner of the DBHDD, but the Governing Board retains sole authority to

remove and replace the Director.  *See* O.C.G.A. § 37-2-6.1(a)(1); O.C.G.A. § 37-1-

1(3).  The Executive Director is directly responsible for hiring and firing CSB

staff, O.C.G.A. § 37-2-6.1(a)(1), while the Board (or the Director, if the Board so

delegates) sets the terms of compensation for CSB personnel, O.C.G.A. § 37-2-

6.1(b)(9), and determines whether and how to provide employee benefits.

O.C.G.A. § 37-2-6.1(b)(7).  The State has no authority to review staff hiring or

firing activity or to alter the CSB's provision of compensation or benefits.[3]  Nor is

---

[3] Advantage additionally argues that CSB personnel practices are governed by the antidiscrimination provision of the Rules of the State Personnel Board, Ga. Comp. R. & Regs.

10

the State empowered to train, discipline, or terminate CSB staff, to dismiss a CSB

Executive Director, or to replace locally appointed Governing Board members.

*Cf., e.g.*, *Lake v. Skelton*, 840 F.3d 1334, 1343 (11th Cir. 2016) (noting that the

State's direct involvement in "training and discipline of deputies [within sheriff's

office] provides further evidence of control by the state").

Advantage contends that, because the Commissioner approves the selection

and compensation of the Executive Director, and because the Director controls the

hiring and firing of CSB staff, it follows that "the state has a great deal more

control over personnel decisions than does any local authority." We disagree.

There is no question that Georgia law dictates the operational structure of each

---

478-1, and thus the decision to terminate Miller was subject to substantial state control. *See* Ga. Comp. R. & Regs. 478-1-.03; O.C.G.A. § 45-20-2(6) (defining "agency" for purposes of application of Rules of the State Personnel Board to include CSBs). Miller counters with reference to a letter that Advantage transmitted to her upon her termination. In that letter, Advantage informs Miller that "the Rules and Regulations of the State Personnel Board do not cover you." As the district court identified, there was further ambiguity in the record below as to whether state personnel standards apply to Advantage employees in general, and the parties have not successfully clarified this issue on appeal.

In light of this ambiguity and Advantage's own admission, we conclude that Advantage has failed to show that state personnel standards applied to Miller's employment. We also note that applicability of state personnel standards would still not be sufficient to tilt the second *Manders* factor in favor of immunity in light of the evidence we highlight above.

11

CSB, but CSBs retain substantial autonomy over day-to-day operations and ordinary personnel management, signaling meaningful local control. We came to a similar conclusion in *Lightfoot*, 771 F.3d at 771–75, in which we declined to find a local Georgia school district entitled to federal immunity under *Manders*. In assessing the second *Manders* factor, we found that control of the school district was locally oriented because it was "subject to the . . . management of county boards of education," which were, in turn, composed of locally elected county residents. *Lightfoot*, 771 F.3d at 771 (internal quotation marks omitted). We acknowledged that the State of Georgia crafted certain aspects of the school board's operations by setting school-board regulations, specifying the manner in which board members would be elected, and setting employee evaluation standards, but we ultimately concluded that "[e]stablishing minimum requirements" for the operation of the school district was "not sufficient to demonstrate [state] control." *Id*. at 773.

Our analysis in *Pellitteri v. Prine*, 776 F.3d 777 (11th Cir. 2015), presents a useful contrast. In that case, we considered the immunity of a local Georgia sheriff's office in the exercise of employment procedures. We concluded that the second *Manders* factor weighed in favor of immunity, highlighting several crucial

12

limitations on the sheriff's autonomy in personnel management: the State strictly regulated the sheriff's power to hire deputies and peace officers by requiring State-administered background checks, physical and mental examinations, and an entrance examination for all candidates; the State retained the power to "functionally terminate" deputy sheriffs through disciplinary measures without the sheriff's consent; and the Governor of Georgia held ultimate authority to discipline or suspend the sheriff himself for incidents of misconduct. *Id*. at 781–82. *See also Stanley v. Broward Cty. Sheriff*, 2016 WL 7229745 (11th Cir. Dec. 14, 2016) (noting that, while the State was empowered to remove local sheriff for misconduct, the State had no control over the appointment or removal of deputies hired by the sheriff; this fact weighed against finding state control); *Lake*, 840 F.3d at 1343 (following *Pellitteri* to conclude that State's direct involvement in sheriff training and discipline evidenced state control). The State of Georgia retains no such control over CSB personnel decisions, is powerless to remove the Executive Director or Board members, and does not limit the Governing Board's discretion to manage personnel matters in the service of local concerns. *Cf. Pellitteri*, 743 F.3d at 782 (noting that the sheriff was primarily accountable to the State—rather than

13

to local authorities—in discharging his duties, and citing this fact as further evidence of substantial state control).

We find our analysis in *Lightfoot* persuasive in this case, especially as contrasted with our conclusion in *Pellitteri*.[4]  The existence of state guidelines regarding the appointment of CSB Governing Boards and state standards for the provision of CSB services is not sufficient to demonstrate substantial state control over Advantage in this case, especially in light of the significant autonomy state law grants to locally appointed Governing Boards.  Advantage has not met its burden of demonstrating that the DBHDD's limited, high-level involvement in the structure and function of CSBs justifies a finding that Advantage is an arm of the State.  Thus, we concur with the district court that the second *Manders* factor weighs against Eleventh Amendment immunity.

---

[4]  Advantage urges that any reference to our reasoning in *Lightfoot* would be misplaced in this case.  To advance this argument, Advantage lists the various ways in which CSBs are unlike state school districts, implicitly asking us to make the following deduction:  Because school districts are not arms of the State, and because CSBs are unlike school districts, it follows that CSBs must be arms of the State.  There are, indeed, many distinctions to be drawn between Georgia-state school districts and CSBs—but there are useful similarities to consider as well.  We decline to ratify Advantage's faulty reasoning, and we therefore consider *Lightfoot* and other Circuit opinions wherever they illuminate the proper application of the *Manders* factors in this case.

14

### C.    Source of Defendant's Funding

We next ask where the defendant derives its funding.  In answering this question, we focus primarily on the quantum of funding the State provides to the defendant entity.  *See Stanley*, 2016 WL 7229745, at *8 (citing *Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 405 F.3d 1298, 1311 (11th Cir. 2005)).  Where relevant, we may also consider the level of control the State exercises over the entity's funding structure, budget, and overall financial autonomy.  *See, e.g.*, *Pellitteri*, 776 F.3d at 782–83 (finding that, although sheriff's office was funded primarily by the county rather than the State, the third *Manders* factor weighed in favor of immunity because the State dictated the office's funding structure); *Williams v. Dist. Bd. of Trs. of Edison Cmty. Coll., Fla.*, 421 F.3d 1190, 1194 (11th Cir. 2005) (noting in analysis of third *Manders* factor that "state approval of institutional budgets evidences state control," which weighed in favor of finding immunity); *Lightfoot*, 771 F.3d at 776–77 (concluding that school board's receipt of "significant funding from the State" was not sufficient to tip the balance toward immunity on third *Manders* factor, as the school board itself retained substantial local control over its own budget).

15

Advantage asserts that the State funds a substantial portion of its operations, but it fails to provide any evidence demonstrating (or even estimating) the actual proportion of state to non-state funding on which it relies. This dearth of evidence is surprising: Advantage's argument relies heavily on the proposition that the State is its primary funder, and Advantage is, of course, uniquely positioned to prove the truth of this assertion. In the absence of such evidence, we also consider the State's involvement in Advantage's financial operations. We ultimately conclude that Advantage has failed to carry its burden of demonstrating that the State exercises meaningful control over the source of its funding or the nature of its budget.

In support of its argument that "the state controls the sources of funds to CSBs," Advantage cites to a single provision of Georgia's enabling statute, under which the State forbids CSBs to tax, to issue bonds, and to "financially obligate the state." O.C.G.A. § 37-2-6.1(e). But Advantage neglects several key elements of the CSB funding structure that weigh against a finding of immunity. As discussed *supra*, CSBs like Advantage are managed locally by Governing Boards, whose members are appointed by county authorities. O.C.G.A. § 37-2-6(b). Each CSB's Governing Board chooses whether to contract with the DBHDD or other state

16

departments to provide health services. O.C.G.A. § 37-2-6(a). The State does not mandate that CSBs contract with it, nor does it require them to contract with parallel local or federal healthcare programs.

The Governing Board also has authority to cease operations of the CSB altogether, O.C.G.A. § 37-2-6.5, or to end its contractual relationship with the State by converting the CSB to a private nonprofit, a unit of a local county, or an arm of a hospital. O.C.G.A. § 37-2-6.4(a). The State has no authority to approve or reject such changes. And as Advantage has made clear, its state funding is service-based—that is, Advantage receives no funding from the State if it does not contract with the State and bill its services to the State under the terms of that contract.

Upon review of this statutory framework, is clear to us that the Governing Board holds unfettered discretion to design its own funding mix. It can, for example, choose to rely primarily on state funds, to contract only with private organizations, or to diversify its funding sources by contracting with private or local organizations in addition to the State. This level of autonomy precludes the State from dictating Advantage's funding portfolio and limits the State's control over Advantage's financial decision-making.

17

Furthermore, Governing Boards enjoy broad autonomy to allocate funds on personnel matters. The Board of each CSB is entitled to review and approve the CSB's annual budget, which "shall provide for securing . . . professionals necessary for the provision of disability and health services." O.C.G.A. 37-2-6.1(b)(2); O.C.G.A. 37-2-6.1(a). The Board is further empowered to determine when and how to provide employment benefits, O.C.G.A. § 37-2-6.1(b)(7); to fix employee compensation, O.C.G.A. § 37-2-6.1(b)(9); and to raise revenues to support daily operations. O.C.G.A. § 37-2-6.1(f)(2). The only personnel-related matter the State is entitled to oversee relates to the employment of the CSB's Executive Director, who exercises daily managerial authority as delegated by the Governing Board. O.C.G.A. § 37-2-6.1(a)(1) (permitting commissioner of DBHDD to review and approve Governing Board's offer of employment to Executive Director and any substantial alterations to terms of compensation but omitting to empower commissioner to remove Director at his discretion).

The fact that the Governing Board, not the State, exercises primary control over Advantage's financial decision-making—especially in the arena of personnel management—weighs against immunity. *Cf., e.g.*, *Ross v. Jefferson Cty. Dep't. of Health*, 701 F.3d 655, 660 (11th Cir. 2012) (finding the fact that health department

18

was funded by county insufficient to "'tip the balance' against immunity" because there was no evidence that county exerted control over the department); *Manders*, 338 F.3d at 1323 (finding that relevant funding of sheriff's office was derived from the State, even though county bore "the major [funding] burden," because State mandated the source of funding, set sheriff's compensation, and limited county's autonomy over sheriff's spending decisions).

### D.    Liability for Judgments against Defendant

Under the final *Manders* factor, we consider "whether the State would bear ultimate responsibility for an adverse judgment" against the defendant entity. *Lightfoot*, 771 F.3d at 777.  Georgia law speaks directly to this factor, establishing that "the liabilities, debts, and obligations of a community service board shall not constitute liabilities, debts, or obligations of the state or any county or municipal corporation and neither the state nor any county or municipal corporation shall be liable for any liability, debt, or obligation of a community service board." O.C.G.A. § 37-2-6(a).  The United States Supreme Court does not require "an actual drain on the state treasury as a per se condition of Eleventh Amendment immunity," *Manders v. Lee*, 338 F.3d 1304, 1327 (11th Cir. 2003), but the

19

statutory limitation of state liability for any judgment against Advantage weighs strongly against finding it an arm of the State.

Advantage acknowledges this statutory limitation but argues that the Georgia state treasury would be meaningfully and unavoidably impacted in the event of an adverse judgment against Advantage. We disagree.

In support of this argument, Advantage attempts to analogize itself to the sheriff's office at issue in *Manders* and the public water utility we considered in *U.S. ex rel. Lesinski v. South Fla. Water Mgmt. Dist.*, 739 F.3d 598 (11th Cir. 2014). In both cases, we found the state treasury indirectly implicated in the defendant entity's liabilities, which cut in favor of immunity. But both cases are distinguishable. In *Manders*, we concluded that the local sheriff's office was subject to direct state control, was financially dependent on the State, and would have been unable shrink its law-enforcement budget in the event of an adverse judgment. 338 F.3d at 1328. By contrast, we find Advantage independent from state control and financially self-sufficient, especially in light of its ability to contract freely and raise its own revenue. *See* O.C.G.A. § 37-2-6(a); O.C.G.A. § 37-2-6.1(f)(2). And in *Lesinski*, we explained that, if judgment creditors "deplete[d] the [water district's] funds, . . . the State would ultimately have to

20

choose between increasing its appropriation to make up the shortfall or shirking its constitutionally mandated duty to 'conserve and protect [the State's] natural resources and scenic beauty.'" 739 F.3d at 605. Advantage concedes that the State of Georgia is under no constitutional duty to provide mental health, developmental disability, or addictive disease services. Our reasoning in *Lesinski* is, therefore, inapposite.

Most significantly, Advantage has failed to present evidence that the State of Georgia would be obligated or incentivized to prop up Advantage in the event of its financial distress or insolvency. Advantage asserts that "CSBs are formed with geographical limitations" set by the State and that, as a result, "[t]here is no legal basis for the state to simply choose to work with another CSB" in a given region if the preexisting CSB were forced to liquidate. This assertion is not supported by Georgia law, which expressly provides that the State may alter and merge the boundaries of each CSB's service area as it deems necessary. O.C.G.A. § 37-2-3(a)–(b). And Advantage provides no evidence that the State could not contract with a private provider if Advantage ceased its operations and neighboring CSBs were unable to absorb its patient base. To be sure, such a service transition would not be costless for the State. But it is not the case—as it was in *Manders* and

21

*Lesinski*—that a judgment against Advantage would require the State to make the difficult choice between footing Advantage's bill and leaving vulnerable citizens without needed care.

We concur with the district court that Advantage has not carried its burden of showing that the state treasury is meaningfully implicated in Advantage's legal liabilities. The final *Manders* factor weighs decisively against finding Advantage an arm of the State for federal immunity purposes.

## II.    Waiver of Eleventh Amendment Immunity

Because we find that Advantage is not entitled to Eleventh Amendment immunity on the evidence presented, we need not consider whether Advantage waived its right to assert this defense by failing to move for dismissal in a timely manner. In so concluding, we echo the district court's observation that "[t]he test to determine [whether] a state has waived its sovereign immunity 'is a stringent one.'" *Barnes v. Zaccari*, 669 F.3d 1295, 1308 (11th Cir. 2012) (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999)).

22

## <u>CONCLUSION</u>

We conclude that three of the four *Manders* factors weigh strongly against finding that Advantage acted as an "arm of the State" for purposes of Eleventh Amendment immunity with respect to Miller's termination.  Under this Court's precedent, Advantage has therefore failed to meet its burden of proving its entitlement to immunity from Miller's suit.  The district court's denial of Advantage's motion to dismiss is **AFFIRMED**.